RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 13a0118p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

APPALACHIAN REGIONAL HEALTHCARE, INC.
and ARH MARY BRECKINRIDGE HEALTH
SERVICES, INC.,

               _Plaintiffs-Appellees_,

    _v._

COVENTRY HEALTH AND LIFE INSURANCE
COMPANY (12-5779); COMMONWEALTH OF
KENTUCKY, CABINET FOR HEALTH AND
FAMILY SERVICES and AUDREY HAYNES,
sued as, "Secretary, Cabinet for Health and
Family Services" (12-5785),

               _Defendants-Appellants._

> Nos. 12-5779/5785

Appeal from the United States District Court
for the Eastern District of Kentucky at Lexington.
No. 5:12-cv-00114—Karl S. Forester, District Judge.

Argued: January 17, 2013

Decided and Filed: April 24, 2013

Before: SILER, GRIFFIN, and STRANCH, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Amy D. Cubbage, McBRAYER, McGINNIS, LESLIE & KIRKLAND, PLLC, Lexington, Kentucky, for Appellant in 12-5779. Christina M. Heavrin, CABINET FOR HEALTH AND FAMILY SERVICES, Frankfort, Kentucky, for Appellants in 12-5785. Stephen R. Price, Sr., WYATT, TARRANT & COMBS, Louisville, Kentucky, for Appellees. **ON BRIEF:** Amy D. Cubbage, Stephen G. Amato, Jason S. Morgan, McBRAYER, McGINNIS, LESLIE & KIRKLAND, PLLC, Lexington, Kentucky, for Appellant in 12-5779. David Brent Irvin, CABINET FOR HEALTH AND FAMILY SERVICES, Frankfort, Kentucky, for Appellants in 12-5785. Stephen R. Price, Sr., Carole D. Christian, John W. Woodard, Jr., Allison Brown Vermilion, WYATT, TARRANT & COMBS, Louisville, Kentucky, for Appellees.

———————————

**OPINION**

———————————

JANE B. STRANCH, Circuit Judge.   This appeal arises from Kentucky's transition to the managed-care model of service delivery for its Medicaid program, through which more than half-a-million indigent residents receive healthcare coverage. Kentucky awarded Coventry Health and Life Insurance Company, a managed-care organization, a contract to administer Medicaid services in southeastern Kentucky. Coventry, in turn, entered into a temporary agreement with Appalachian Regional Healthcare, the dominant hospital care provider in that area, to provide its members in-network hospital care and other services in Appalachian's facilities.

Soon after the transition occurred in November 2011, Coventry realized it was losing money on its deal with the state. This was partly because Kentucky required that Coventry's network include Appalachian, whose patients, on average, were sicker and more expensive to treat. Coventry also learned that not all of its competitors were required to contract with Appalachian. Coventry pressed state policymakers to increase its payment rates. Finding no success, it noticed termination of Appalachian's contract, which would have made thousands of low-income Medicaid recipients unable to access their healthcare providers at Appalachian's facilities without first paying (often costly) fees.

Appalachian sued Coventry and various state defendants to prevent termination of its contract. The district court issued a preliminary injunction that required Coventry to keep Appalachian in its network for four months longer than the contract specified. This order expired on November 1, 2012. The court also denied Coventry's motion to require Appalachian to post a security bond. Coventry and the state defendants appeal from the injunction. Coventry alone appeals from the bond denial. Because no recognized exception enables us to review the expired injunction, we **DISMISS AS**

**MOOT** the parties' appeal as to it. And because the district court did not abuse its discretion in denying bond, we **AFFIRM** that order.

## I. BACKGROUND

For many years, Kentucky provided medical care to its poorest citizens through Medicaid, a cooperative federal-state funding program, using a traditional fee-for-service model. *See generally* 42 U.S.C. § 1396-1. Under it, a state is directly responsible for paying providers for services that Medicaid beneficiaries receive according to a fee schedule the state sets. *See id.* § 1396a(a)(30)(A). But in November 2011—in response to ballooning Medicaid costs and resulting pressures on the state's budget—Kentucky decided to scuttle its fee-for-service plan and transitioned to a managed-care program.

The theory of managed care is relatively simple. Rather than pay providers directly every time a Medicaid beneficiary receives care, the state instead contracts with managed-care organizations (MCOs) and pays them a flat "capitation rate" each month to provide, within certain limits, all of the care a beneficiary needs. The state pays the same amount regardless of whether the beneficiary receives healthcare services or not. So the MCO bears the risk that the costs of care may exceed the capitation payment. But on the other side, it stands to profit if beneficiaries use fewer services.

In exchange for receiving a capitation payment, an MCO is responsible for three principal tasks: enrolling Medicaid beneficiaries as members; forming a contracted network of healthcare providers to care for its members; and paying providers for their services. An MCO then directs its members to in-network providers, with whom the MCO has negotiated discounted rates. When members go out-of-network, they receive only limited benefits and may pay more for services.

Echoing managed care's many proponents, Kentucky decided that injecting market-based principles into the Medicaid payment model would improve healthcare access and quality by eliminating unnecessary care, enhancing coordination among providers, emphasizing preventative care, and promoting healthy lifestyles. Kentucky

also assumed it would save the state money. *But see* Michael Sparer, *Medicaid managed care: Costs, access, and quality of care*, Robert Wood Johnson Foundation (Sept. 2012), http://www.rwjf.org/content/dam/farm/reports/reports/2012/rwjf401106 (examining peer-reviewed academic literature on the effects of Medicaid managed care and finding lower-than-expected fiscal savings, a mixed impact on access to care, and scant evidence of quality-of-care improvements) (last visited April 23, 2013).

Kentucky obtained permission in September 2011 from the Centers for Medicare and Medicaid Services (CMS), the federal agency that administers the Medicaid program, *see* 42 U.S.C. § 1316(a)(1), to transition to managed care. To implement the plan, the Cabinet contracted with three MCOs—Coventry, Kentucky Spirit, and Wellcare—to administer Medicaid benefits to more than 560,000 Kentuckians. The MCOs were to operate in seven of eight Medicaid regions into which the state is subdivided. The Medicaid region involved in this case, Region 8, consists of nineteen counties in eastern and southeastern Kentucky that are among the most economically depressed, underserved, and medically needy in the Commonwealth. (They include Bell, Breathitt, Clay, Floyd, Harlan, Johnson, Knott, Knox, Laurel, Lee, Leslie, Letcher, Magoffin, Martin, Owsley, Perry, Pike, Whitley, and Wolfe counties.)

During the initial implementation phase in November 2011, the Cabinet assigned each Medicaid beneficiary to one of the three contracted MCOs. *See* 907 Ky. Admin. Regs. 17:010 § 1(5). Beneficiaries could change their assigned MCO, but only during the first 90 days after they were assigned or annually during an open-enrollment period. *Id*. § 1(12)(a). Outside of these times, however, a beneficiary could only switch MCOs "for cause." This would occur, for example, if a beneficiary lacked access to covered services or qualified providers. *Id*. § 7(7)(g). The timeliness of a "for cause" transfer to another MCO was not guaranteed, though, as the process could take more than 60 days. *Id*. § 2(6)(a).

A raft of federal and state statutes and regulations, as well as the terms of each MCO's agreement with the Cabinet, create reciprocal obligations between MCOs, the

Cabinet, and the federal government.  Two are relevant here.  The first are the so-called network-adequacy requirements, which obligate an MCO to maintain a provider network that guarantees certain services are accessible to its members within specified times or distances from their homes.  Network-adequacy requirements are found in federal and state law.  *See, e.g.*, 42 C.F.R. § 438.206(b)(1)(v); 907 Ky. Admin. Regs. 17:015 §§ 2(3)(a), (7).  Kentucky's contract with Coventry incorporates several of these network-adequacy requirements.  And it also requires Coventry to "strictly adhere to all applicable federal and Commonwealth law (statutory and case law), regulations and standards."  The second obligation relevant in this case requires providers to be paid on a timely basis for claims submitted to MCOs.  *See, e.g.*, 42 U.S.C. § 1396n(b)(4); Ky. Rev. Stat. § 304.17A-702.  Like the network-adequacy requirements, the prompt-pay requirements also are incorporated into Kentucky's MCO contracts.

The Cabinet entered into an MCO agreement with Coventry in July 2011.  Among other things, the agreement required Coventry to establish a provider network to deliver healthcare services to approximately 64,000 beneficiaries in Region 8.  To build its network, Coventry contracted with Appalachian, which provided healthcare to an estimated 25,000 beneficiaries in that region.  Coventry and Appalachian entered into a temporary agreement that allowed Coventry's members there to receive care at Appalachian's facilities while the two parties negotiated a more complete contract.  The temporary agreement was set to expire on June 30, 2012, but allowed the parties to continue it beyond that date or terminate it on 30 days' notice.

The temporary agreement included three provisions pertinent to this appeal.  The first required Appalachian and Coventry to "recognize and abide by all applicable Commonwealth and federal laws, regulations and guidelines," which the agreement "incorporate[d] by reference."  The second relevant provision mirrored the statutory prompt-pay requirements described above and obligated Coventry to pay claims within 30 days of receipt.  And the third was a continuation-of-benefits clause that protected certain Coventry members from interruptions in their healthcare in the event the agreement was terminated.  This clause required Appalachian to continue providing

services to Coventry members who were hospitalized or receiving treatment when the agreement was terminated, and women who were four or more months pregnant.

The temporary agreement went into effect on November 1, 2011. Coventry and Appalachian ultimately failed to negotiate a full contract. On March 29, 2012—less than five months after the managed-care transition occurred, but long after the initial 90-day period during which Coventry members could switch to another MCO without cause—Coventry notified Appalachian that it intended to terminate the temporary agreement on May 4, 2012.

The parties' inability to come to an agreement was not simply a matter of hardened bargaining positions. As Coventry explained, the dispute was a by-product of the company's mounting troubles with Kentucky, which centered on Coventry's belief that the Cabinet was playing favorites with Kentucky Spirit, a competitor MCO. Initially, when Coventry was establishing its provider network in Region 8, it was told that it had to include Appalachian in its network to meet Kentucky's network-adequacy standards. Coventry assumed its competitors had to do the same, but it was wrong: the Cabinet did not require Kentucky Spirit to do so.

Coventry was not pleased when it learned of this. The reason for its discontent was that Appalachian's Medicaid patients were sicker than other Medicaid patients in Region 8, which meant they cost more to care for. Having Appalachian in its network caused Coventry to lose money, as the capitation rate it negotiated with Kentucky was insufficient to cover the costs of these members' care. And it meant Coventry was disadvantaged relative to a competitor MCO like Kentucky Spirit that was not required to cover—and pay the higher cost of caring for—Appalachian's sicker patients.

Coventry importuned policymakers to fix the problem. In a letter to Kentucky Governor Steven L. Beshear written on April 10, 2012, Coventry complained that the Cabinet's unequal treatment of MCOs created an "uneven playing field," resulting in "an unprecedented shift of higher-risk members to Coventry" that allowed Kentucky Spirit

to "game the system" for "an unfair advantage." Coventry warned that "the continued viability of the Medicaid managed care program is at stake."

When the time came to negotiate with Appalachian, Coventry did not hesitate to lay its dispute with the Commonwealth at Appalachian's feet. Kentucky's "failure to ensure that all MCOs meet the same robust standards for network adequacy," Coventry told Appalachian, "is at the heart of [*Appalachian's*] problem." Coventry's stratagem was to put Appalachian in the middle of its fight with the Cabinet to pressure policymakers to solve Coventry's financial problems.

Appalachian sued Coventry, the Cabinet, and the Secretary on April 16, 2012, alleging numerous claims, including state-law contract and tort claims, and violations of state and federal prompt-pay laws and network-adequacy requirements. Days later, Coventry reiterated that it would "not contract with [Appalachian] until we can get the Commonwealth to do the right thing." Coventry threatened that the lawsuit would be "an enormous drain for Appalachian."

On May 1, 2012, Appalachian moved to enjoin Coventry from terminating the temporary agreement. It asked the court to order Coventry to maintain Appalachian facilities in its network or to preauthorize its members to receive out-of-network treatment in them, and to direct Coventry to comply with its contractual prompt-pay obligations. Appalachian argued that Coventry's termination of the agreement was impermissible because it left Coventry with an inadequate provider network under state and federal law, which in turn breached the agreement's requirement that both parties comply with those laws. Appalachian also charged that Coventry was in violation of the agreement's continuation-of-benefits provision because it refused to preauthorize services for pregnant Appalachian patients that the provision protected.

The court held a day-long evidentiary hearing on the preliminary injunction that focused on the adequacy of Coventry's network without Appalachian. On June 20, 2012, it issued a lengthy order granting in part Appalachian's motion. Critical to this appeal, the court concluded that Appalachian showed a likelihood of success on its

breach-of-contract claim due to Coventry's alleged breaches of network-adequacy requirements incorporated into the agreement, the agreement's prompt-pay requirements, and its continuation-of-benefits provision.

Without the injunction, the court worried, Medicaid beneficiaries in Region 8 would "be cut off from their life-long physicians and hospitals" and have no opportunity to learn about the choices they had to receive care after the agreement terminated. So the injunction did two things. It extended the temporary agreement to November 1, 2012, so beneficiaries could switch to a new MCO without cause during the open enrollment period. And it directed Coventry to furnish Appalachian a list of certain Coventry members so Appalachian could explain to those individuals how to continue to receive care in Appalachian facilities after the agreement expired.

As the district court made no provision for bond in granting the injunction, Coventry moved to require one pursuant to Federal Rule of Civil Procedure 65(c). After Coventry and Appalachian briefed the matter, the court denied the motion. It reasoned that the injunction would result in "little, if any" harm to Coventry because Coventry had voluntarily agreed during the injunction proceedings to maintain Appalachian as a preauthorized, out-of-network provider through November 1, 2012, and to pay Appalachian the rates spelled out in the temporary agreement for services provided under its continuation-of-care clause.

Coventry now appeals from both the preliminary injunction and the motion denying bond. The Cabinet contests only the injunction.

## II. ANALYSIS

### A. Mootness

"The case or controversy requirement in Article III of the Constitution determines the power of the federal courts to entertain a suit[.]" *ACLU v. Nat'l Sec. Agency*, 493 F.3d 644, 688 (6th Cir. 2007) (Gibbons, J., concurring). "We have no power to adjudicate disputes which are moot." *McPherson v. Mich. High Sch. Athletic*

*Ass'n, Inc.*, 119 F.3d 453, 458 (6th Cir. 1997) (en banc) (internal quotation marks omitted). A case is moot "when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome." *Hodges v. Schlinkert Sports Assocs., Inc.*, 89 F.3d 310, 312 (6th Cir. 1996) (internal quotation marks omitted). When an injunction order expires, there generally is nothing for an appellate court to review.

Because the preliminary injunction here expired by its terms on November 1, 2012, a challenge to its issuance is moot unless a recognized exception applies. In response to our request for supplemental briefing on the question of mootness (which the parties did not initially address), the state defendants concede that their appeal is moot. Coventry, however, seeks shelter under the exception that permits courts to hear moot cases involving injuries that are "capable of repetition, yet evad[e] review." *See Weinstein v. Bradford*, 423 U.S. 147, 149 (1975) (per curiam). To fit within the exception, a challenged action must satisfy two requirements. *See Sandison v. Mich. High Sch. Athletic Ass'n, Inc.*, 64 F.3d 1026, 1030 (6th Cir. 1995). First, it must be too short in duration to be fully litigated before it ceases. *Id*. Second, there must be a reasonable expectation that the same parties will be subjected to the same action again. *Id*.

The action challenged here is a court order that required Coventry to maintain a contractual relationship with Appalachian for four months longer than Coventry had agreed. Whether this duration meets the first prong of the exception is irrelevant because Coventry cannot satisfy the second one. Coventry argues that it reasonably expects to be forced into unnegotiated contractual relationships with other hospitals in the future because the injunction Appalachian obtained has encouraged other dissatisfied providers with which Coventry contracts to consider similar legal tactics to gain negotiating leverage against Coventry. Indeed, the district court recently granted one hospital's motion to intervene in Appalachian's case against Coventry. By Coventry's lights, this portends that others will follow suit and that the district court will issue further injunctions.

But Coventry's argument fails because our precedents require Coventry to show that *Appalachian*—not just any other healthcare provider—will subject Coventry to the same objectionable action. *See Chirco v. Gateway Oaks, LLC*, 384 F.3d 307, 309 (6th Cir. 2004) ("When the suit involves two private parties . . . the complaining party must show a reasonable expectation that he would again be subjected to the same action by the *same defendant*."). *But see Libertarian Party of Ohio v. Blackwell*, 462 F.3d 579, 600 (6th Cir. 2006) (describing an exception to the "same party" requirement in the election-law context). Because Coventry and Appalachian no longer have a contract, no realistic possibility exists that a court will again enjoin Coventry from breaching its contract with Appalachian. Coventry is not required to contract with Appalachian, so the acrimonious dealings that led this appeal are not likely to be repeated.

Further, Coventry has not shown that a court is likely to grant other hospitals' requests to enjoin Coventry's termination of their provider agreements. Nor has it explained why the circumstances animating the injunction here—extending the contract's duration to line up its expiration with the window during which Medicaid beneficiaries can easily transfer to another MCO—will present again. Another provider's intervention in Appalachian's suit is a far cry from an unlawful injunction. "Should this court be confronted with repeated controversies of this nature . . . it could determine that the dispute truly was capable of repetition, yet evading review." *McIntyre v. Levy*, No. 06-5989, 2007 WL 7007938, at *1 (6th Cir. Aug. 1, 2007) (order) (internal quotation marks omitted). As it stands, Coventry's augury isn't enough.

In sum, the exception to mootness that enables parties to challenge actions that are capable of repetition but evade review does not apply here. The expired injunction the parties' appeal is moot, which takes away our power to evaluate it.

**B. Motion for bond**

Coventry also appeals the district court's denial of its motion for bond. A district court abuses its discretion in setting a bond amount when it applies the wrong legal standard, applies the right standard incorrectly, or relies on clearly erroneous factual

findings.  *USACO Coal Co. v. Carbomin Energy, Inc.*, 689 F.2d 94, 100 (6th Cir. 1982); *Paschal v. Flagstar Bank*, 297 F.3d 431, 434 (6th Cir. 2002).

A court may issue a preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined."  Fed. R. Civ. P. 65(c).  While this language appears to be mandatory, "the rule in our circuit has long been that the district court possesses discretion over *whether* to require the posting of security."  *Moltan Co. v. Eagle-Picher Indus., Inc.*, 55 F.3d 1171, 1176 (6th Cir. 1995) (citing *Roth v. Bank of the Commonwealth*, 583 F.2d 527, 539 (6th Cir. 1978)) (emphasis added).  A court errs when it "fail[s] to . . . expressly consider[] the question of requiring a bond" when the issue has been raised.  *Roth*, 583 F.2d at 539; *accord NACCO Materials Handling Grp., Inc. v. Toyota Materials Handling USA, Inc.*, 246 F. App'x 929, 953 (6th Cir. 2007).  Otherwise, it has "broad discretion in setting the bond amount."  *Static Control Components, Inc. v. Lexmark Int'l, Inc.*, 697 F.3d 387, 400 (6th Cir. 2012).

There is little doubt that the district court here considered Coventry's bond request.  Coventry asked the court to require Appalachian to post bond two days after the injunction issued, Appalachian opposed the motion, and the court issued a two-page denial.  The court reasoned that,

> based on the record as well as the evidence and argument presented at the preliminary injunction hearing on June 12, 2012, the Court has previously determined that Coventry will suffer "little, if any" harm as a result of the injunction due to the fact that the preliminary injunction simply requires Coventry to maintain the contractual obligation it voluntarily entered into.

Undoubtedly, the court below considered the bond issue.  The real issue is whether the court below relied on erroneous factual findings—and so abused its discretion—when it concluded that Coventry was unlikely to suffer harm from the injunction because that order merely memorialized an obligation Coventry had already made.  The court was wrong to characterize the injunction in this way, as that order clearly required Coventry

to do more than what it had agreed to voluntarily. Given the circumstances, though, this was not reversible error.

The preliminary injunction required Coventry to "maintain the status quo until November 1, 2012, including paying [Appalachian] in-network rates," which the temporary agreement set at 100% of Kentucky's Medicaid fee schedule for most services. Absent the injunction, Coventry would pay claims at the in-network rate only until June 30, 2012. After that, Coventry says, it would pay Appalachian as an out-of-network provider at 90% of the fee schedule. The bottom line for Coventry is that the injunction required it to pay more in claims that it otherwise would have from June 30, 2012, to November 1, 2012.

We might be inclined to agree with Coventry's position if it were a practical certainty that Coventry would pay the lower rate during this four-month period. But it is not. Coventry certainly offered to pay the lower rate when it unsuccessfully negotiated with Appalachian over a full agreement. The trouble is that Appalachian never accepted this offer, nor did it have to.

To the contrary, Appalachian submitted that without a contract, it should be paid on a *quantum meruit* basis for the reasonable value of its services. It forecasts that this will be *greater* than its current contract rates with Coventry, which do not cover the costs of Appalachian's services. *See, e.g.*, *Cherry v. Augustus*, 245 S.W.3d 766, 779 (Ky. App. 2006) (describing quantum meruit as "an equitable doctrine granting one who has rendered services in a quasi-contractual relationship the reasonable value of services rendered" (internal quotation marks omitted)). Indeed, from the start of this litigation, Appalachian has sought a declaration from the court that it was entitled to recover the reasonable value of its services. And though the district court recently ruled that Appalachian is entitled to be compensated for the reasonable value of its services, it has not yet determined what that value might be.

Against this backdrop—with Appalachian's claim to a higher rate than it received under the temporary agreement still undecided, and with Coventry showing

only that the lower rate was a rejected offer—the district court did not rely on clearly erroneous factual findings in denying Coventry's bond motion. Coventry's assertion that it would pay less is speculative at best.

The content of Coventry's bond request supports this conclusion. Although no rule formally requires it, a party seeking a security bond regularly estimates the damages it will suffer if it complies with a preliminary injunction. This serves three purposes. It gives the party seeking the injunction a sense of its liability if the injunction is later found to have been unlawful. It provides the court with a basis to set the proper amount (though not necessarily a definitive one). And it furnishes an appellate court with a marker against which to review the district court's determination (though, again, not necessarily an exclusive one).

Here, Coventry could have estimated the costs of complying with the injunction by, for example, totaling up the difference between in-network rates and out-of-network rates for services Appalachian provided to Coventry's members over a prior four-month period. Instead, the proposed order for bond that Coventry submitted to the district court featured a blank line in place of a dollar amount. Presented with no estimate of Coventry's potential damages to rebut Appalachian's argument that it was entitled to *more* money during this period, the court concluded that "little, if any" harm was shown, and denied the bond motion. Given these circumstances, the district court did not abuse its discretion.

## III. CONCLUSION

For these reasons, we **DISMISS AS MOOT** the parties' appeal of the preliminary injunction order and **AFFIRM** the district court's denial of Coventry's bond motion.