RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 18a0217p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

NOELLE HANRAHAN; CHRISTOPHER HEDGES; DERRICK JONES; JAMES RIDGEWAY; SIDDIQUE ABDULLAH HASAN; GREGORY CURRY; KEITH LAMAR; JASON ROBB; GEORGE W. SKATZES,

　　　　　　　　*Plaintiffs-Appellants*,

　　　*v.*

GARY C. MOHR; JOELLEN SMITH,

　　　　　　　　*Defendants-Appellees*.

No. 17-4316

───────────────

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 2:13-cv-01212—Edmund A. Sargus Jr., Chief District Judge.

Argued:  August 2, 2018

Decided and Filed:  September 26, 2018

Before:  SUHRHEINRICH, CLAY, and GIBBONS, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:**  Raymond V. Vasvari, Jr., VASVARI | ZIMMERMAN, Cleveland, Ohio, for Appellants.  Mindy Worly, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellees.  **ON BRIEF:**  Raymond V. Vasvari, Jr., VASVARI | ZIMMERMAN, Cleveland, Ohio, for Appellants.  Mindy Worly, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellees.

---

**OPINION**

---

JULIA SMITH GIBBONS, Circuit Judge.   This case concerns the Ohio Department of Rehabilitation and Correction's restrictions on in-person media interviews with certain prisoners. The plaintiffs in this case are prisoners who participated in the 1993 Lucasville prison riot and journalists who unsuccessfully sought in-person, recorded interviews with these prisoners.  They brought suit under 42 U.S.C. § 1983, alleging that the prison's interview policies violated their rights under the First and Fourteenth Amendments.  The district court granted partial summary judgment for the defendants and later granted the defendants' motion to dismiss.  We affirm.

I.

In April 1993, a major prison riot took place at the Southern Ohio Correctional Facility in Lucasville, Ohio—now known as the Lucasville prison riot.  The riot began when prisoners overpowered a prison guard and took his keys, allowing the prisoners to then overpower the remaining guards in that section of the prison.  The rioting prisoners ultimately took a dozen guards hostage and gained complete control of the prison's L-block.  The riot went on for eleven days, and during those eleven days, one guard and nine prisoners were murdered, and many more were injured.  In addition to the human losses, tens of millions of dollars' worth of damage was done to the prison facility.

Plaintiffs Siddique Abdullah Hasan, Gregory Curry, Keith LaMar, Jason Robb, and George Skatzes ("Prisoner Plaintiffs") are prisoners who participated in the Lucasville riot. Hasan, LaMar, Robb, and Skatzes were sentenced to death for their involvement in the riot, and Curry was sentenced to life in prison.  Hasan, Curry, LaMar, and Robb are incarcerated in the Ohio State Penitentiary and are classified as restricted population inmates, a classification that is reserved for prisoners who "pose a direct threat to the safety of persons, including themselves, or an elevated, clear[,] and ongoing threat to the safe and secure operations of the facility."[1]

---

[1]All Ohio inmates are assigned a security classification.  At the time the suit was filed, prisoners were assigned security classifications between level 1 and level 5, with 1 being the lowest security risk and 5 being the

DE 42-2, 2017 Restrictive Housing Procedures, Page ID 1014. Skatzes is classified as a general population inmate and is incarcerated at the Chillicothe Correctional Institution.

Since the Lucasville riot, journalists have sought interviews with its leaders, including with the Prisoner Plaintiffs. Plaintiffs Noelle Hanrahan, Christopher Hedges, Derrick Jones, and James Ridgeway ("Media Plaintiffs") are professional journalists who sought in-person, recorded interviews with the Prisoner Plaintiffs in the lead-up to the twentieth anniversary of the Lucasville prison riot. Their interview requests were all denied.

On December 9, 2013, the Prisoner Plaintiffs and Media Plaintiffs filed suit under 42 U.S.C. § 1983 against the Director of the Ohio Department of Rehabilitation and Correction ("ODRC"), Gary Mohr, and ODRC's Communications Chief, JoEllen Smith, alleging that the interview denials violated the First and Fourteenth Amendments because they were based on the interviews' anticipated content—discussion of the Lucasville prison riots.[2] Plaintiffs sought a declaratory judgment that the defendants "violated Plaintiffs' constitutionally protected rights to media access" by "denying all media requests to interview Prisoner Plaintiffs because of the anticipated content of the interviews." DE 1, Compl., Page ID 27. They also sought a preliminary and permanent injunction "prohibiting Defendants from denying in-person media access to inmates involved with the Lucasville prison uprising[] and requiring that if Defendants

---

highest. Inmates with a level 4 or 5 classification were considered restricted population inmates. Inmates with a level 1 through 3 classification were considered general population inmates. Inmates on death row could be general population or restricted population inmates depending on their security level. Under this system, Hasan, Curry, LaMar, and Robb were classified as security level-5 inmates.

Since the filing of the suit, and as of February 5, 2017, the Ohio Department of Rehabilitation and Correction has updated its inmate security classification policies and definitions. Under the new policies, inmates with a security classification 1 through 4 are now considered general population inmates. Restricted population inmates—formerly level 5 inmates—are now divided into Restrictive Housing and Extended Restrictive Housing. Extended Restrictive Housing has additional sub-levels (ERH1, ERH2, and ERH3). This change in terminology does not affect Prisoner Plaintiffs' restricted population status, and under the new system, Hasan, Robb, LaMar, and Curry are classified as ERH prisoners. ERH status "is reserved for those whose violent, disruptive, predatory, riotous[,] or other serious misbehavior poses a serious threat to other inmates, staff, the orderly operation of the institution, or the general public." DE 42-1, 2017 ERH Procedures, Page ID 997.

[2]The plaintiffs' complaint also alleged that the prison's policies denying media requests to interview prisoners involved in Lucasville had no rational basis, in violation of the Due Process and Equal Protection Clauses of the Fourteenth Amendment, and impacted the right of the public to have access to information, in violation of the First and Fourteenth Amendments. They have not raised these claims on appeal, and we therefore do not consider them here. *See Youghiogheny & Ohio Coal Co. v. Milliken*, 200 F.3d 942, 955 (6th Cir. 1999).

wish to deny a particular request for such access, they must provide a specific, factual basis for denying the particular request." *Id.*

The defendants filed a motion for summary judgment, which the district court granted in part and denied in part. The district court concluded that the interview denials as to the restricted population inmates were permissible because ODRC had a written media policy "prohibit[ing] all prisoners classified as part of the restricted population from participating in face-to-face or video recorded interviews," meaning that the restricted population Prisoner Plaintiffs were categorically ineligible for the type of interviews that had been requested. DE 37, Summ. J. Order, Page ID 894. And because the restricted population inmates had adequate alternative channels of communication with the media available, such as sending letters and making direct phone calls, the district court determined that the defendants were entitled to summary judgment on Hasan's, LaMar's, Robb's, and Curry's claims. The district court, however, denied summary judgment for the defendants on Skatzes's claim, as ODRC had no similar categorical restriction on interviews with general population inmates, and the defendants acknowledged that Skatzes was prohibited from such interviews due to his involvement with the Lucasville riots. The court therefore concluded that there was a genuine issue of material fact regarding whether the interview denials as to Skatzes were unlawful.

After the district court's summary judgment order, ODRC modified its media policies to delete certain language that previously authorized ODRC to inquire into the nature of the interview and to consider the impact of an interview on victims when determining whether to approve a media interview request with a non-restricted prisoner. In August 2017, ODRC also granted all outstanding requests of the Media Plaintiffs to interview Prisoner Plaintiff Skatzes. On August 22, 2017, the defendants filed a motion to dismiss the plaintiffs' remaining claims as moot. The district court granted the motion to dismiss, concluding that the defendants' voluntary cessation of allegedly illegal conduct by modifying the media policies and granting the Skatzes interview requests mooted the only remaining claims in the case and that it had "no reason to doubt the genuineness of their revocation of the allegedly wrongful policies." DE 67, Mot. Dismiss Order, Page ID 1285. Plaintiffs then filed this appeal.

On appeal, the plaintiffs argue that the district court erred in granting summary judgment for the defendants on the restricted population inmates' claims and that the district court erred in dismissing the Media Plaintiffs' and Skatzes's claims as moot.  We address each claim in turn.

## II.

### A.

We review a district court's grant of summary judgment *de novo*.  *Gillis v. Miller*, 845 F.3d 677, 683 (6th Cir. 2017).  Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party bears the burden of showing that no genuine issue of material fact exists, *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986), while the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (internal citations and quotation marks omitted).  Drawing all reasonable inferences in favor of the nonmoving party, we then determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Id*. at 251–52; *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

### B.

Several principles "necessarily frame our analysis of prisoners' constitutional claims." *Turner v. Safley*, 482 U.S. 78, 84 (1987).  First, "federal courts must take cognizance of the valid constitutional claims of prison inmates," since "[p]rison walls do not form a barrier separating prison inmates from the protections of the Constitution."  *Id*.; *see Procunier v. Martinez*, 416 U.S. 396, 405 (1974).  Consequently, "[w]hen a prison regulation or practice offends a fundamental constitutional guarantee, federal courts will discharge their duty to protect constitutional rights."  *Martinez*, 416 U.S. at 405–406.  Still, "the constitutional rights that prisoners possess are more limited in scope than the constitutional rights held by individuals in society at large."  *Shaw v. Murphy*, 532 U.S. 223, 229 (2001).

Second, given the "complex and intractable" problems of prison administration, we recognize that federal courts are "ill equipped to deal with the increasingly urgent problems of prison administration and reform." *Martinez*, 416 U.S. at 405; *see Thompson v. Campbell*, 81 F. App'x 563, 566 (6th Cir. 2003). For this reason, we generally "defer[] to the judgments of prison officials in upholding [prison] regulations against constitutional challenge" so long as the regulations are "reasonably related to legitimate penological interests." *Shaw*, 532 U.S. at 229 (quoting *Turner*, 482 U.S. at 89).

We consider four factors—the *Turner* factors—to determine whether a prison regulation is reasonably related to legitimate penological interests and therefore constitutional. *Id.* at 229–30; *Turner*, 482 U.S. at 89–91. "First, there must be a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it." *Turner*, 482 U.S. at 89 (internal quotation marks and citation omitted). If this first factor is not met, "the regulation is unconstitutional, and the other factors do not matter." *Muhammad v. Pitcher*, 35 F.3d 1081, 1084 (6th Cir. 1994) (citing *Turner*, 482 U.S. at 89–90). If, however, the first factor is met, we then balance the three remaining considerations: (1) whether alternative means of exercising the right remain open to prison inmates; (2) the impact that accommodation of the right would have on guards, other inmates, and on prison resources; and (3) "the absence of ready alternatives." *Turner*, 482 U.S. at 89–90; *see Thompson*, 81 F. App'x at 566.

1.

"The first *Turner* factor is multifold" and requires that "the governmental objective underlying the regulations at issue is [1] legitimate and [2] neutral, and that [3] the regulations are rationally related to that objective." *Thornburgh v. Abbott*, 490 U.S. 401, 414 (1989). Appellants argue that the interview denials as to the restricted population Prisoner Plaintiffs were not "neutral" because they were motivated by "content-based animus" and therefore fail to meet *Turner*'s required first prong. CA6 R. 15, Appellant Br., at 21. We disagree for two reasons.

First, ODRC maintains two media policies. Policy 01-COM-09 is the general media policy that applies to prisoners who are not on death row, including Prisoner Plaintiff Curry. Policy 01-COM-13 applies to prisoners who are on death row and distinguishes between death

row prisoners who have a scheduled execution date and those who do not. This policy applies to Prisoner Plaintiffs Hasan, LaMar, Robb, and Skatzes, who are all under a sentence of death, but who do not have scheduled execution dates. At the time of the events underlying this suit, both policies provided that "population status" would be reviewed when "considering the inmate for eligibility" for a media interview or interaction. *See* DE 32-2, 2012 Media Policy, Page ID 386; DE 32-2, 2010 Death Row Media Policy, Page ID 356. The media policies—both those in effect when the plaintiffs filed their complaint and the updated policies in effect now—prohibit face-to-face media interviews with restricted-population inmates, maintaining that only general population inmates are eligible for in-person media interviews. The restricted population inmates do not contest that their classification brings them under this umbrella, and appellants' brief points to no restricted population inmates that were granted interviews. Thus, the prohibition on face-to-face media interviews with restricted population inmates applied uniformly and, contrary to plaintiffs' assertion, did not depend on the anticipated content of any interview. *See Pell v. Procunier*, 417 U.S. 817, 828 (1974) (prison regulation banning face-to-face media interviews with prisoners that "operate[d] in a neutral fashion, without regard to the content of the expression" was constitutional).

Second, and more fundamentally, even were these interview denials based on the interview's anticipated content, they could still be constitutional. *See Thornburgh*, 490 U.S. at 415. Appellants are incorrect that the "neutrality" requirement of *Turner*'s first prong requires a prison regulation to be completely content neutral.

In *Thornburgh*, the Supreme Court made clear that "the Court's reference to 'neutrality' in *Turner* was intended to go no further than its requirement in *Martinez* that 'the regulation or practice in question must further an important or substantial governmental interest unrelated to the suppression of expression.'" *Id.* (quoting *Martinez*, 416 U.S. at 413). Moreover, *Thornburgh* makes clear that it is not the *regulation itself* that must be neutral, but instead that *Turner* requires "*the governmental objective underlying the regulations at issue* [be] legitimate and neutral."[3] *Id.* at 414 (emphasis added). Therefore, the "technical sense" of the term

---

[3]Although the Court in *Thornburgh* quotes *Turner*'s language that "[w]e have found it important to inquire whether prison regulations restricting inmates' First Amendment rights operated in a neutral fashion, without regard

"neutral" does not require that a regulation be divorced from the speech's content—indeed, the Court recognized that the publication regulations upheld in *Thornburgh* "turn[ed], to some extent, on content." *Id.* at 415–16. Instead, the relevant question is whether the regulation furthers an important interest unrelated to the suppression of expression. *Id.* Thus, in *Thornburgh*, the Court concluded that a prison policy prohibiting inmates from receiving outside publications "determined detrimental to the security, good order, or discipline of the institution or if [they] might facilitate criminal activity" was neutral, as it served a legitimate security purpose. *Id.* at 403 n.1, 415–16 ("Where, as here, prison administrators draw distinctions between publications solely on the basis of their potential implications for prison security, the regulations are 'neutral' in the technical sense in which we meant and used that term in *Turner*.").

Assuming that, as alleged, the defendants have a "*de facto* ban" on all face-to-face media interviews with participants in the Lucasville riot in order to prevent discussion of the Lucasville riot by the people involved in it, such a policy could still be valid under *Turner* and *Thornburgh*. Although this policy could be articulated as a ban on specific content—media interviews with leaders of Lucasville about Lucasville—its purpose "further[s] an important or substantial governmental interest unrelated to the suppression of expression": prison security. *See Thornburgh*, 490 U.S. at 415 (quoting *Martinez*, 416 U.S. at 413). Interviews with Lucasville riot leaders and participants about the Lucasville riot are only prohibited *because* these interviews implicate a legitimate security concern. Identifying specific speech that is problematic does not automatically make a policy invalid. An example used by the Court in *Thornburgh* helps to clarify this point. In emphasizing neutrality's technical meaning in the *Turner* context, the Court observed:

> [T]he Court upheld content distinctions in *Jones* [*v. North Carolina Prisoners' Labor Union, Inc.*, 433 U.S. 119 (1977)], where internal distribution of a prisoners' union's materials was prohibited while distribution of materials from the Jaycees and Alcoholics Anonymous was permitted. It upheld these

---

to the content of the expression," *Thornburgh*, 490 U.S. at 415 (alteration in original) (quoting *Turner*, 482 U.S. at 90), it follows this with the clarification that the "reference to 'neutrality' in *Turner* was intended to go no further than [to] require[] . . . that 'the regulation or practice in question must further an important or substantial governmental interest unrelated to the suppression of expression.'" *Id.* (quoting *Procunier*, 416 U.S. 396 at 413).

distinctions against an equal protection challenge because the distinctions had a rational basis in the legitimate penological interests of the prisons: in contrast with the prisoners' union, the Jaycees and Alcoholics Anonymous "were seen as serving a rehabilitative purpose, working in harmony with the goals and desires of the prison administrators, and both had been determined not to pose any threat to the order or security of the institution."

*Thornburgh*, 490 U.S. at 415 n.13 (citations omitted).[4]  Determining that specific speech, based on its content, carries a security risk while other speech does not and then drawing a distinction based on this legitimate penological objective satisfies *Turner*'s neutrality requirement. "[T]o state the distinction is to furnish the justification: security." *Hammer v. Ashcroft*, 570 F.3d 798, 801 (7th Cir. 2009).

Therefore, contrary to appellants' contention, content-neutrality is not required in a prison regulation.  In *Thompson v. Campbell*, 81 F. App'x 563 (6th Cir. 2003), this court upheld a Tennessee prison policy of "withholding mail advocating 'anarchy' or containing 'obscenity.'" *Id.* at 567.  We concluded that the regulation was "neutral" in the *Turner* sense because it "dr[e]w distinctions between publications solely on the basis of their potential implications for [a legitimate penological objective]"—in that case, security, order, and rehabilitation.  *Id.* (second alteration in original) (quoting *Thornburgh*, 490 U.S. at 415–16).  Though, like the restriction in *Thornburgh*, the prohibition "turn[ed], to some extent, on content," the restriction was still "neutral" because it furthered an important government interest unrelated to the suppression of expression.  *See id.*; *see also Thornburgh*, 490 U.S. at 415; *Hayes v. Tennessee*, 424 F. App'x 546, 550–51 (6th Cir. 2011) (extensively and approvingly quoting *Thompson* in the as-applied context).

Indeed, it would make little sense to state that any content-based restriction is automatically invalid, as it could incentivize prisons to adopt over-inclusive policies in search of a content-neutral baseline.  As the Court observed in *Thornburgh*, "greater consistency might be attainable only at the cost of a more broadly restrictive rule," which "might itself run afoul of the

---

[4]In contrast, the censorship in *Martinez* of prisoner mail "that 'unduly complain[s]' or 'magnif[ies] grievances,' express[es] 'inflammatory political, racial, religious or other views,' or [is] 'defamatory' or 'otherwise inappropriate'" was "not 'neutral' in the relevant sense" because it "had not been found 'unrelated to the suppression of expression.'" *Thornburgh*, 490 U.S. at 416 n.14; *see Martinez*, 416 U.S. at 415.

second *Turner* factor, *i.e.*, the presence or absence of 'alternative means of exercising the right' in question." *Thornburgh*, 490 U.S. at 417 n.15 (quoting *Turner*, 482 U.S. at 90). If the prison's goal is to prohibit face-to-face interviews with the leaders of the Lucasville riot, then it is entitled to have a regulation to that effect, so long as its purpose is not to suppress expression but is instead to further an important or substantial governmental interest. *Id.* at 415. And it is not difficult to see the legitimate penological justification for such a restriction here—prison security.

"[C]entral to all other corrections goals is the institutional consideration of internal security within the corrections facilities themselves." *Pell*, 417 U.S. at 823. And it is likely that a prison's single greatest internal security concern is that of a violent prisoner riot. *See* CA6 R. 16, Appellee Br., at 25 ("A riot resulting in physical harm to staff, prisoners, or the prison itself would necessarily represent the most disconcerting and enduring of failures, namely the inability to preserve essential prison security and safety."). This concern is all too real for ODRC, which experienced one of the longest and most brutal prison riots in U.S. history—the Lucasville prison riot. The defendants state in their answer that "they have consistently denied all members of the press face-to-face media access to any prisoner convicted of crimes committed during the April 1993 Lucasville riot due to ODRC's concerns regarding safety and security and the fear that these prisoners would thereby gain a disproportionate degree of notoriety and influence among their fellow inmates, leading to substantial disciplinary problems that could engulf large portions of the prisons." (*See, e.g.*, DE 10, Answer, Page ID 61.)

In both *Pell* and *Saxbe v. Washington Post*, the Supreme Court recognized that interviews with the press can make celebrities of some inmates. *See Saxbe v. Washington Post Co.*, 417 U.S. 843, 848–49 (1974) ("The experience of the Bureau accords with that of the California Department of Corrections and suggests that the interest of the press is often 'concentrated on a relatively small number of inmates who, as a result, (become) virtual 'public figures' within the prison society and gai(n) a disproportionate degree of notoriety and influence among their fellow inmates.' As a result those inmates who are conspicuously publicized because of their repeated contacts with the press tend to become the source of substantial disciplinary problems that can engulf a large portion of the population at a prison." (internal citations omitted)); *Pell*, 417 U.S.

at 831–32; *see also Hammer v. Ashcroft*, 570 F.3d 798, 801 (7th Cir. 2009) ("The security justification that carried the day in *Pell* and *Washington Post* was that interviews with the press make celebrities of some inmates. This increases tensions within prisons (those who don't receive public attention may react with envy); and if some inmates use the press to disparage others (or their beliefs, or the organizations to which they belong), the tensions will be greater. More: the interviewed prisoners get swelled heads and 'tend to become the source of substantial disciplinary problems that can engulf a large portion of the population at a prison.'" (internal citation and quotation marks omitted)).

Thus, although the Lucasville riot occurred 25 years ago, it is reasonable for ODRC to fear that the leaders of the Lucasville riot, who already have and will continue to have "a disproportionate degree of notoriety and influence among their fellow inmates," *Pell*, 417 U.S. at 831, will gain even more notoriety and influence from further exposure. This fear is bolstered by the Prisoner Plaintiffs' continued record of prison disturbances. For instance, Prisoner Plaintiffs also led the Mansfield riot in 1997, and Hasan, Curry, LaMar, and Robb organized a strike in honor of the Attica riot in September 2016 that involved 46 inmates and put ODRC in "critical incident mode." This security concern, then, is both legitimate and "neutral" within the technical meaning of *Turner*. *See Thompson*, 81 F. App'x at 567 ("Maintaining security constitutes a legitimate penological interest.").[5]

"As for a 'rational connection' between the policy and these interests, the issue is not whether the prohibited materials have in fact caused problems or are even 'likely' to cause problems, but whether a reasonable official might think that the policy advances these interests." *Thompson*, 81 F. App'x at 567 (citing *Thornburgh*, 490 at 417). And the relationship between prison security and a policy limiting interviews with prison riot leaders about a prison riot is surely not "so remote as to render the policy arbitrary or irrational." *Turner*, 482 U.S. at 89–90; *see also Thompson*, 81 F. App'x at 567. Because in-person interviews may "facilitate[], enhance[,] and legitimize[] [Prisoner Plaintiffs'] attempts to organize prison disturbances,"

---

[5]We note that there is no evidence that the prison rule was adopted for the purpose of concealing mistreatment of prisoners or misconduct by prison officials, rather than for ODRC's stated purpose of prison security.

(R. 32-3, Vorhies Decl., PageID 434), and thus present a continuing threat to prison security, we think this policy of preventing those kinds of interviews "falls well within the realm of reasonable." *Thompson*, 81 F. App'x at 567. Therefore, there is a rational connection between a policy prohibiting face-to-face interviews with Lucasville participants and the legitimate, neutral penological interest of prison security, satisfying *Turner*'s first prong. *See Thornburgh*, 490 U.S. at 414; *Thompson*, 81 F. App'x at 567.

2.

Turning to the remaining *Turner* factors, we are persuaded that, on balance, they support the constitutionality of ODRC's policies here.

Alternative means of exercising the right remain available to prisoners here. As the district court recognized, "[r]estricted population inmates are permitted to send out letters and make direct phone calls[, and] Prisoner Plaintiffs have been permitted to utilize these channels of communication." DE 37, Summ. J. Order, Page ID 894. Indeed, in 2016, Hasan was able to call into the nationally broadcast National Public Radio show "On Point" to discuss a national prison strike. *See The National Prison Strike (According To Prisoners)*, NPR/WBUR (Sept. 28, 2016), http://www.wbur.org/onpoint/2016/09/28/prisoners-inside-prison-strike ("Siddique Abdullah Hasan . . . called us from inside the Ohio State Penitentiary . . . and shared [his] views on the action with host Tom Ashbrook and our listeners."); DE 32-6, Def. Expert Rep., Page ID 465–66 (citing this). Appellants contend that in-person interviews are an "essential part" of journalism with "no ready substitute." CA6 R. 15, Appellant Br., at 34. But the Supreme Court has instructed that "'the right' in question must be viewed sensibly and expansively," *Thornburgh*, 490 U.S. at 417, and given prisoners' other means of interacting with the media, adequate alternative means of exercising the right are available here. *See Pell*, 417 U.S. at 824–28.

The final two factors, the impact of accommodation of the right and the availability of ready alternatives, support the restrictions' constitutionality whether we review the restriction as based on prisoners' restricted population status or as based on the discussion of Lucasville. *Turner*, 482 U.S. at 89–90; *see Thornburgh*, 490 U.S. at 418. ODRC has emphasized its concerns about the impact that in-person media interviews about the Lucasville riot with

Lucasville participants would have on other inmates and prison guards, citing its "fear that these prisoners would thereby gain a disproportionate degree of notoriety and influence among their fellow inmates, leading to substantial disciplinary problems that could engulf large portions of the prisons." *E.g.*, DE 10, Answer, Page ID 61. This concern is legitimate, as the Prisoner Plaintiffs have already participated in one violent prison riot, and as the Lucasville riot shows, disciplinary problems can pose the highest risk to prison guards and other prisoners. *See Thompson*, 81 F. App'x at 567 (allowing prisoners to receive anarchist material "would have a significant impact on prison guards, other inmates, and the allocation of prison resources" because the court could not "discount the possibility" that "volatile prisoners" would gain access to such materials and "rise up against [the] jailors"). Similar concerns exist for restricted population inmates generally, who have been deemed by ODRC to "pose a direct threat to the safety of persons, including themselves, or an elevated, clear[,] and ongoing threat to the safe and secure operations of the facility." DE 42-2, 2017 Restrictive Housing Procedures, Page ID 1014.

The plaintiffs claim that, even so, instead of banning in-person media interviews, to mitigate these concerns, the defendants could simply enforce existing policies that "interdict contraband and material that would disrupt order and security" from coming into the prisons, meaning any in-person media interviews about the riot would not be seen within the prison walls. CA6 R. 15, Appellant Br., at 37. In addition to taking an idealistic view of prisons' ability to control the flow of incoming contraband, this would do nothing to quell ODRC's articulated concerns regarding Prisoner Plaintiffs' notoriety *within* the prison. In *Pell*, the Supreme Court recognized the California prison system's legitimate concern with "press attention being concentrated on a relatively small number of inmates who, as a result, became virtual 'public figures' within the prison society and gained a disproportionate degree of notoriety and influence among their fellow inmates" and who "[b]ecause of this notoriety and influence . . . often became the source of severe disciplinary problems." *Pell*, 417 U.S. at 831–32. Defendants have articulated the same concern here, and plaintiffs point to no "alternative that fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests." *Thornburgh*, 490 U.S. at 418 (quoting *Turner*, 482 U.S. at 91).

Therefore, applying the *Turner* factors, the challenged restrictions are constitutional, as they are reasonably related to legitimate penological interests. *Turner*, 482 U.S. at 89–90; *see Thornburgh*, 490 U.S. at 409.

III.

We next address the district court's dismissal of Skatzes's and the Media Plaintiffs' claims for mootness. "We review de novo a district court's decision regarding mootness." *Cleveland Branch, N.A.A.C.P. v. City of Parma*, 263 F.3d 513, 530 (6th Cir. 2001).

"The case or controversy requirement in Article III of the Constitution determines the power of the federal courts to entertain a suit." *Appalachian Reg'l Healthcare, Inc. v. Coventry Health & Life Ins. Co.*, 714 F.3d 424, 429 (6th Cir. 2013) (quoting *ACLU v. Nat'l Sec. Agency*, 493 F.3d 644, 688 (6th Cir. 2007) (Gibbons J., concurring)). We do not have the power to adjudicate disputes that are moot, and "[t]he mootness inquiry must be made at every stage of a case." *McPherson v. Michigan High Sch. Athletic Ass'n, Inc.*, 119 F.3d 453, 458 (6th Cir. 1997) (en banc). "[A] case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Powell v. McCormack*, 395 U.S. 486, 496 (1969). "The test for mootness is 'whether the relief sought would, if granted, make a difference to the legal interests of the parties.'" *McPherson*, 119 F.3d at 458 (alteration omitted) (quoting *In re Crane v. Indiana High Sch. Athletic Ass'n*, 975 F.2d 1315, 1318 (7th Cir. 1992)).

Here, the district court concluded that the remaining plaintiffs' requests for declaratory and injunctive relief were moot because ODRC had granted the Media Plaintiffs' requests for face-to-face interviews with Prisoner Plaintiff Skatzes and because the updated ODRC media policy eliminated from consideration the "nature of the interview" and the impact on victims in deciding whether to grant interviews with general population inmates. *See* DE 67, Mot. Dismiss Order, Page ID 1285–86. The district court rejected plaintiffs' voluntary cessation argument, concluding that the defendants gave the court "no reason to doubt the genuineness of their revocation of the allegedly wrongful policies." DE 67, Mot. Dismiss Order, Page ID 1285.

On appeal, plaintiffs again argue that defendants' voluntary cessation of the alleged unconstitutional practice by amending ODRC policies does not moot the case because the

"policy changes were recent, made on the authority of a single official, easily rescind[able], [and] significantly altered long established practices." CA6 R. 15, Appellant Br., at 39. In addition, they allege that there remained a live controversy between the parties because, even with these changes, ODRC's media policies still allow defendants "unfettered discretion" to deny interview requests. *Id.* at 42–43. We conclude that the district court correctly dismissed these claims as moot.[6]

A.

Normally "a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000) (quoting *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982)). But "cessation of the allegedly illegal conduct by government officials has been treated with more solicitude by the courts than similar action by private parties," as government "self-correction provides a secure foundation for a dismissal based on mootness so long as it appears genuine.'" *Bench Billboard Co. v. City of Cincinnati*, 675 F.3d 974, 981–82 (6th Cir. 2012) (quoting *Mosley v. Hairston*, 920 F.2d 409, 415 (6th Cir. 1990)); *see also Jones v. Haynes*, 17-5846, 2018 WL 2684310, at *3 (6th Cir. June 5, 2018).

On July 13, 2017, ODRC voluntarily modified both of its media policies to delete "victims issues that would present a concern" and "the nature of the interview" from the list of issues that would be considered when reviewing an inmate's eligibility for a media interview or interaction. DE 55-2, 2017 Death Row Media Policy, Page ID 1195, 1199; DE 55-3, 2017 Media Policy, Page ID 1205, 1210. Additionally, on August 14, 2017, Smith emailed Hanrahan to let her know that "[i]n accordance with ODRC's revised media policies which have been under consideration since 2013, and became effective July 13, 2017, [O]DRC approve[d] [her] request for an interview with inmate George Skatzes." DE 55-1, Smith Declaration, Page ID 1194 (Ex. A). Smith also made a declaration to the court, filed with defendants' motion to

---

[6]Because we affirm the district court's dismissal on mootness grounds, we do not consider the merits of plaintiffs' claims that interview denials as to Skatzes, a general population inmate, were required to be content-neutral; however, our earlier analysis as to the restricted inmates' claims would express skepticism toward such a conclusion.

dismiss, that to the extent "any other of the Plaintiffs made similar requests [to interview Skatzes], those requests to interview George Skatzes [were] approved [as of] August 21, 2017." *Id.* at 1192. In light of these changes, ODRC media policies no longer endorse consideration of the "anticipated content of the interviews" in granting or denying interviews with general population prisoners, and Skatzes—the remaining Prisoner Plaintiff and a Lucasville riot participant—is able to conduct in-person media interviews. *See* DE 1, Compl., Page ID 2. This is the precise conduct challenged in the complaint.

Plaintiffs acknowledge that the policy changes "ostensibly solved the problem of content-based animus, by cabining the decision-making power of the Defendants," CA6 R. 15, Appellant Br., at 42, but contend that the defendants have not shown that these policies, which were "changed just weeks before trial filings were due," are going to stay, *id.* at 65. Given the solicitude granted government officials, we disagree. The new policies were formally promulgated and approved by the ODRC director after a lengthy internal process. And there is no indication that ODRC will return to its previous policies, and the defendants have represented that the new policies will remain in place. Thus, we conclude that the "self-correction" "appears genuine." *Bench Billboard Co.*, 675 F.3d at 981–82 (citation omitted).

B.

Still, the plaintiffs maintain that, regardless of the policy modifications, there remains a live controversy between the parties because the ODRC still has "continued and unfettered discretionary power to deny interviews" under the new policies, and the relief requested included a "declaration that Defendants had unreasonably limited media access to inmates, and an injunction prohibiting them from denying such access in the future." DE 15, Appellant Br., at 42–43. We disagree.

The plaintiffs' argument that the defendants have unfettered discretion to deny any interview request rests on language in the new policies that provides that "The Director/designee shall have discretion to grant or deny any interview request." DE 55-2, 2017 Death Row Media Policy, Page ID 1198; DE 55-3, 2017 Media Policy, Page ID 1207. While it is true that the changes to the media policies did not impact the baseline ability of the prison personnel to

control media access, it is hard to say that granting injunctive or declaratory relief as to Skatzes would "make a difference to the legal interests of the parties" in light the actions the defendants have taken. *McPherson*, 119 F.3d at 458 (quoting *Crane*, 975 F.2d at 1318). ODRC has granted all outstanding interview requests with Skatzes and changed its policies to remove challenged factors from consideration when determining inmate eligibility for interviews.

Moreover, we have previously found cases seeking declaratory and injunctive relief moot after prisons have changed policies that were challenged in litigation. *See, e.g.*, *Yaacov v. Collins*, Case No. 09-4148 (6th Cir. Dec. 1, 2010) (concluding that an inmate's claims for declarative and injunctive relief were moot because the prison changed its policy); *Demis v. Sniezek*, 558 F.3d 508, 513 (6th Cir. 2009) (noting that a change in prison policy rendered injunctive relief in the habeas petition moot because "no actual injury remain[ed] that the Court could redress with a favorable decision in this appeal"); *Jaami v. Compton*, 248 F.3d 1149 (6th Cir. 2000) (table) ("This change in the prison policy renders Jaami's requests for declaratory and injunctive relief moot because no need exists for this court to issue an injunction when prison authorities have voluntarily changed the allegedly unconstitutional practice."); *Kellogg v. Shoemaker*, 46 F.3d 503, 506–07 & n.3 (6th Cir. 1995) (concluding based on mootness that there was "no need for this court to issue an injunction when the parole board has voluntarily changed its allegedly unconstitutional practices"); *see also Willis v. Campbell*, 102 F. App'x 481 (6th Cir. 2004) ("Because Willis sought only injunctive and declaratory relief from a policy that is no longer effective, we DISMISS the present appeal as moot.").

As to the plaintiffs' requested declaratory relief, to the extent the plaintiffs seek "a judicial articulation of rights in this case," DE 60, Plaintiffs' Resp., Opp. Mot. Dismiss, Page ID 1231, the Supreme Court has admonished that the courts "are not in the business of pronouncing that past actions which have no demonstrable continuing effect were right or wrong." *Spencer v. Kemna*, 523 U.S. 1, 18 (1998). And because the interview requests with Skatzes have been granted and ODRC has changed its policy so that the defendants will no longer look to the nature of the interview or victims' issues, we doubt that "there is a substantial controversy . . . of sufficient immediacy and reality to warrant the issuance of a declaratory

judgment." *Preiser v. Newkirk,* 422 U.S. 395, 402 (1975) (emphasis omitted) (quoting *Md. Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941)).

As to the plaintiffs' requested injunctive relief, "[i]f an intervening circumstance deprives the plaintiff of a 'personal stake in the outcome of the lawsuit,' at any point during litigation, the action can no longer proceed and must be dismissed as moot." *Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 72 (2013) (quoting *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477–478 (1990)). Because the plaintiffs may now interview Skatzes, they no longer need an injunction to prevent the defendants from denying interviews based on the fact that Skatzes was involved in the Lucasville riot. *See Renne v. Geary*, 501 U.S. 312, 320–21 (1991) ("Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief if unaccompanied by any continuing, present adverse effects." (citations and alterations omitted)).

Other than declaratory and injunctive relief, the plaintiffs sought attorney's fees, but a request for attorney's fees is not enough to save a case from being dismissed as moot. *Demis*, 558 F.3d at 513. Consequently, ODRC's policy modifications, coupled with ODRC's approval of the media requests to interview Prisoner Plaintiff Skatzes, means there is no longer a live case or controversy. We therefore affirm the district court's grant of the defendants' motion to dismiss on those claims.

## IV.

For the reasons stated, we affirm the district court.