RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 21a0097p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

WENDI C. THOMAS,

>    *Plaintiff-Appellant*,

>    *v.*

> CITY OF MEMPHIS, TENNESSEE; JIM STRICKLAND,
> Individually; URSULA MADDEN, Individually,

>    *Defendants-Appellees*.

No. 20-6118

Appeal from the United States District Court
for the Western District of Tennessee at Memphis.
No. 2:20-cv-02343—John Thomas Fowlkes, Jr., District Judge.

Argued:  April 27, 2021

Decided and Filed:  April 30, 2021

Before:  SUHRHEINRICH, GRIFFIN, and DONALD, Circuit Judges.

_____

## COUNSEL

**ARGUED:**  Paul R. McAdoo, THE REPORTERS COMMITTEE FOR FREEDOM OF THE
PRESS, Brentwood, Tennessee, for Appellant.  Bruce A. McMullen, BAKER, DONELSON,
BEARMAN, CALDWELL & BERKOWIZ, P.C., Memphis, Tennessee, for Appellees.
**ON BRIEF:**  Paul R. McAdoo, THE REPORTERS COMMITTEE FOR FREEDOM OF THE
PRESS, Brentwood, Tennessee, for Appellant.  Bruce A. McMullen, BAKER, DONELSON,
BEARMAN, CALDWELL & BERKOWIZ, P.C., Memphis, Tennessee, for Appellees.  Michael
F. Smith, THE SMITH APPELLATE LAW FIRM, Washington, D.C., for Amici Curiae.

---

**OPINION**

---

BERNICE BOUIE DONALD, Circuit Judge.  Plaintiff Wendi Thomas ("Plaintiff"), a well-known media figure in Memphis, alleges that the City of Memphis ("the City" or "Defendant") excluded her from the City's Media Advisory List in retaliation for her news coverage of Mayor Jim Strickland.  Plaintiff filed suit against the City, seeking injunctive and declaratory relief based on her claims that the City's actions amounted to violations of the First, Fifth, and Fourteenth Amendments to the United States Constitution and Article I, Section 19 of the Tennessee Constitution.  Thirteen days after Plaintiff filed suit, the City changed its media relations policy so that all media advisories would be posted on the City's website or on designated social media.

The City moved for dismissal, and, finding that the City's actions mooted Plaintiff's claims, the district court granted that motion.  For the following reasons, we **AFFIRM** the district court.

I.

Before adopting its current media relations policy, the City of Memphis maintained an email listserv ("Media Advisory List") to alert members of the media about newsworthy events and activities in Memphis.  Among the media members included on the Media Advisory List was Plaintiff, who is a fixture of the Memphis journalism community and the founder, editor, and publisher of *MLK50: Justice Through Journalism* ("MLK50"), an online news website with a focus on issues at "the intersection of poverty, power, and public policy."  Through at least January 22, 2018, Plaintiff's personal Gmail address was included on the City's Media Advisory List.  Plaintiff alleges that, at some point thereafter, the City removed that email address from the Media Advisory List without notice to her.

On May 13, 2019, Plaintiff emailed Ursula Madden ("Madden"), the City's Chief Communications Officer, and requested that three email addresses associated with MLK50 be added to the Media Advisory List.  The following day, Arlenia Cole ("Cole"), a media affairs

manager for the City, replied to Plaintiff, copied Madden's official email account, and stated "[w]ill do and thanks for the updates."

Several months later, Plaintiff recognized that the City had not added her to the Media Advisory List when a journalist from another news outlet forwarded Plaintiff an email—dated October 23, 2019—sent by the City to the listserv. Between October 29, 2019 and January 14, 2020, Plaintiff renewed her request via email on seven occasions and alleges that she left voicemails with and sent text messages to Madden and Cole but never received a response.

On March 16, 2020 and on April 13, 2020, Plaintiff's counsel wrote letters to the City explaining that the City's refusal to add her to the listserv violated Plaintiff's rights under both the United States and Tennessee Constitutions. In a letter dated April 15, 2020, Jennifer Sink ("Sink"), the City's Chief Legal Officer acknowledged receipt of the March 16, 2020 letter but stated that she could not respond immediately because the City had recently imposed a State of Emergency in response to the COVID-19 pandemic. Sink did however note that she "[would] respond as soon as able."

Plaintiff believes that her alleged removal and subsequent exclusion from the Media Advisory List was "motivated by Defendants' disapproval of [her] coverage of the City[,]" because, in 2017, Madden declined her request for a one-on-one interview with Mayor Strickland.

In an email dated June 27, 2017, Madden wrote to Plaintiff: "You have demonstrated, particularly on social media, that you are not objective when it comes to Mayor Strickland . . . I won't say that he will never do an interview with MLK50Memphis, but I will say that you've given him no reason to consider it."

On May 13, 2020, Plaintiff filed an action under 42 U.S.C. § 1983 in the district court, asserting claims against the City of Memphis, Mayor Strickland, and Madden[1] for violations of the First, Fifth, and Fourteenth Amendments to the United States Constitution and Article I, Section 19 of the Tennessee Constitution. In her Complaint, Thomas alleges that her exclusion

---

[1]The district court dismissed Thomas' claims against Strickland and Madden on other grounds, and the issues on appeal are limited to Thomas' claims against the City.

from the Media Advisory List "substantially disrupt[ed] and interfere[d] with her ability to gather news and report on the City and Mayor Strickland."  In particular, she claims that her exclusion from the Media Advisory List "disrupted and interfered with her efforts to the cover the COVID-19 crisis" because the City was using the email listserv to "distribute login information so that those on the [list] [could] attend and ask questions during daily virtual press conferences hosted by the Joint Task Force via Zoom."

In her Complaint, Thomas sought the following relief:

1) an injunction requiring the City to add her to the Media Advisory List, or, alternatively, requiring the City to contemporaneously provide her with all media advisories and other communications distributed to the Media Advisory List;

2) an injunction requiring the City to "devise and publish explicit and meaningful standards" for the Media Advisory List, as well as procedures to give members of the media notice of the reasons for exclusion and an opportunity to contest their exclusion;

3) a declaration that her exclusion from the Media Advisory List violated the First, Fifth, and Fourteenth Amendments; and

4) a declaration that her exclusion from the Media Advisory List was unconstitutional, in violation of Article I, Section 19 of the Tennessee Constitution.

On May 26, 2020, thirteen days after Plaintiff filed suit, the City adopted PM-62-28 (the "new media relations policy") "pursuant to which all media advisories would be made publicly available on the City's website and on various other social media platforms."  Effective that date, the City now provides that "[m]edia advisories from the Mayor's Communication Office regarding news briefings, news conferences, and written statements will be posted on the City of Memphis (COM) website at www.memphistn.gov and designated COM social media platforms."  Further, the new media relations policy explicitly prohibits the City from using an email listserv to send its media advisories and further provides that any employee who violates this new policy—by attempting to recreate such a listserv—"will be subject to disciplinary action . . . up to and including termination of employment."

On September 16, 2020, the district court dismissed as moot Plaintiff's claims against the City, finding that (1) the City "voluntarily 'charted an entirely new course with [PM-62-28]'"

and "voluntarily ceased relying upon the Media Advisory List to disseminate media advisories;" (2) "[i]n enacting [PM-62-28], the City undertook an internal review and obtained formal written approval from the City's Chief Legal Officer and Chief Human Resources Officer;" (3) the process that led to the new media relations policy was "not ad hoc or discretionary," but rather was a "regulatory action" that involved the approval of "two different individuals working in two different offices;" and (4) the City "affirmatively stated that [it] will not be using the Media Advisory List or any other email listserv," which "sufficiently represented that the City will not return to the challenged practice of disseminating information through the Media Advisory List."

Plaintiff filed this appeal, contending that her claims against the City are not moot.

## II.

We generally review *de novo* a district court's decision to dismiss for lack of subject-matter jurisdiction under Rule 12(b)(1). *Howard v. Whitbeck*, 382 F.3d 633, 636 (6th Cir. 2004). If the lower court, however, "does not merely analyze the complaint on its face, but instead inquires into the factual predicates for jurisdiction, the decision on the Rule 12(b)(1) motion resolves a 'factual' challenge rather than a 'facial' challenge, and we review the district court's factual findings for clear error." *Id.* (citing *RMI Titanium Co. v. Westinghouse Elec. Corp.*, 78 F.3d 1125, 1133–35 (6th Cir. 1996); *United States v. Ritchie*, 15 F.3d 592, 598 (6th Cir. 1994); *Ohio Nat'l Life Ins. Co. v. United States*, 922 F.2d 320, 325 (6th Cir. 1990)). The City's challenge to the existence of subject-matter jurisdiction in this case is a factual one because the district court analyzed the Complaint in light of the City's new media relations policy, which the City contends deprives the Court of a factual predicate for jurisdiction. We therefore review the district court's factual findings for clear error and its legal conclusions *de novo*. *See Howard*, 382 F.3d at 636.

## III.

The sole issue before us in this appeal is whether Plaintiff's claims for injunctive and declaratory relief are moot after the City voluntarily ceased using the Media Advisory List in favor of the new media relations policy. The City's voluntary cessation of the Media Advisory List will moot the case if the City can show (1) that "there is no reasonable expectation that the

alleged violation will recur" and (2) "interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *Speech First v. Schlissel*, 939 F.3d 756, 767 (6th Cir. 2019) (internal citations omitted).

Article III, § 2 of the United States Constitution vests federal courts with jurisdiction to address "actual cases and controversies." *Coal. for Gov't Procurement v. Fed. Prison Indus.*, *Inc.*, 365 F.3d 435, 458 (6th Cir. 2004) (citing U.S. CONST. art III, § 2). Federal courts are prohibited from rendering decisions that "do not affect the rights of the litigants." *Id.* (citing S*outhwest Williamson Cty. Cmty. Assoc. v. Slater*, 243 F.3d 270, 276 (6th Cir. 2001)). A case becomes moot "when the issues presented are no longer live or parties lack a legally cognizable interest in the outcome." *See Cleveland Branch, N.A.A.C.P. v. City of Parma, Ohio*, 263 F.3d 513, 530 (6th Cir. 2001) (quoting *Cty. of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979)). The "heavy burden" of demonstrating mootness falls on the party asserting it. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs (TOC), Inc.*, 528 U.S. 167, 189 (2000).

A case will generally not be dismissed where a plaintiff's claim has been mooted by a defendant's voluntary cessation of allegedly improper behavior. *Id.* at 189. However, a case is considered moot by the defendant's voluntary cessation of the conduct at issue where the defendant can show: (1) "there is no reasonable expectation that the alleged violation will recur"; and (2) "interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *Speech First*, 939 F.3d at 767 (internal citations omitted); *see also Laidlaw*, 528 U.S. at 170 ("[A] defendant claiming that its voluntary compliance moots a case bears the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur.").

"[T]he burden in showing mootness is lower when it is the government that has voluntarily ceased its conduct[,]" because the government's ability to "self-correct[] provides a secure foundation for a dismissal based on mootness so long as [the change] appears genuine." *Speech First*, 939 F.3d at 767 (quoting *Bench Billboard Co. v. City of Cincinnati*, 675 F.3d 974, 981 (6th Cir. 2012)). "[W]e presume that the same allegedly wrongful conduct by the government is unlikely to recur." *Id.* However, "[w]hile all governmental action receives some solicitude, not all action enjoys the same degree of solicitude . . . [the Court] takes into

account the totality of the circumstances surrounding the voluntary cessation, including the manner in which the cessation was executed." *Id.*

In *Speech First*, we provided the following framework for addressing what degree of solicitude—or deference—is owed to a government entity that voluntarily ceases allegedly illegal conduct:

> Where the government voluntarily ceases its actions by enacting new legislation or repealing the challenged legislation, that change will presumptively moot the case unless there are clear contraindications that the change is not genuine.
>
> On the other hand, where a change is merely regulatory, the degree of solicitude the voluntary cessation enjoys is based on whether the regulatory processes leading to the change involved legislative-like procedures or were ad hoc, discretionary, and easily reversible actions.
>
> If the discretion to effect the change lies with one agency or individual, or there are no formal processes required to effect the change, significantly more than the bare solicitude itself is necessary to show that the voluntary cessation moots the claim.
>
> Where regulatory changes are effected through formal, legislative-like procedures, we have found that to moot the case the government need not do much more than simply represent that it would not return to the challenged policies.

*Id.* at 768–69 (citations omitted).

Against that legal backdrop, we address each prong of the voluntary-cessation test.

**A. The district court did not err in concluding that the City met its burden in demonstrating that there is no reasonable expectation that it will re-implement the Media Advisory List.**

We first consider whether the City has established that there is no reasonable expectation that the alleged violation will recur.  Here, the City's new media relations policy is not the product of actual legislation but rather a regulatory change implemented by the Mayor's office.  Therefore, the City is not entitled to a presumption of mootness, and we must resolve two issues: (1) whether the City implemented the new media relations policy pursuant to a "legislative-like" or "ad hoc" procedure; and (2) whether the City has demonstrated that the challenged practice is not likely to recur.  As to the second issue, if we find that the City changed its media relations

policy pursuant to a "legislative-like" procedure, the City need only make a "simpl[e] represent[ation] that it would not return to the challenged policies" in order to moot the case. *Id.* at 769. If the change in policy was "ad hoc, discretionary, and easily reversible[,]" the City must show "significantly more than the bare solicitude itself" to demonstrate that the change in the media relations policy moots Plaintiff's claims. *Id.* at 768.

### 1. The City's change in media relations policy was "legislative-like."

Plaintiff contends that the City's change in media relations policy was necessarily "ad hoc" because the City generally has discretion to reverse its policies. In support of that argument, Plaintiff makes note of the fact that the City's Personnel Policy and Procedure Manual ("the Manual") provides that the City "reserves the right to suspend, revise or revoke any of its policies, procedures, and/or practices at any time without notice." It also states that "[t]he Director of Human Resources promulgates, publishes, and interprets all policies set forth in the Personnel Manual[.]" The City responds that its "Media Relations Policy has never been part of a formal ordinance, but rather is a formal policy promulgated by the Mayor's Administration[,]" and, as such, it did not come into force through a legislative vote. Despite this distinction, Plaintiff and Amicus take issue with the fact that there was no formal legal requirement that compelled the process the City went through to implement the change nor a requirement that the City go through the same process again for further changes to the policy.

When assessing the "formality" of a government's regulatory change, we look to whether the change became operative in a manner analogous to legislation, even if the process that led to the change did not involve hallmarks of traditional legislative activity, such as elected officials casting a vote or notice-and-comment rulemaking through an administrative tribunal. For example, in *Hanrahan v. Mohr*, 905 F.3d 947 (6th Cir. 2018), a group of media and prisoner plaintiffs argued that a prison's decision to change its media-access policy should not moot their constitutional claim "because the policy changes were recent, made on the authority of a single official, easily rescind[able], [and] significantly altered long established practices." *Id.* at 960–61 (internal quotations omitted) (alterations in original). We rejected that argument, noting that the new policies had been "formally promulgated and approved by the [prison] director," who provided a sworn declaration that they would remain in place going forward and that the

interview requests by the plaintiffs had been granted under that new policy, as would similar future requests. *Id.* at 961; *see also Youngstown Publ'g Co. v. McKelvey*, 189 F. App'x 402, 403–06 (6th Cir. 2006) (concluding that a challenge to a local city government's policy—specifically, an edict by the Mayor of Youngstown, Ohio "prohibiting members of his administration from communicating with the Business Journal"—was mooted by the election of a new mayor who eliminated the previous administration's policy).

On the other side of the "legislative-like"/"ad-hoc" spectrum is *Speech First* itself. In *Speech First*, a university president and other senior officials changed the definitions of the terms "harassing" and "bullying" from the school's office of student conflict resolution website after the plaintiff filed the complaint challenging the vagueness of the definitions. *Speech First*, 939 F.3d at 761–62. Despite the university's assurance that the new definitions were "approved by senior University officials, including the University's president[,]" we rejected the university's contention that it had undergone a formal legislative-like process to implement the changes. *Id.* We said as much because the university had failed to "point[] to any evidence suggesting that it would have to go through the same process or some other formal process to change the definitions again." *Id.* We therefore deemed the changes to be "ad hoc" and concluded that the university was entitled only to the lower form of solicitude that we afford government entities in voluntary cessation cases.

The City's change in media relations policy was legislative-like and thus is different in a significant way than the university's change in definitions at issue in *Speech First*. In *Speech First*, there was no indication that the approval process by which the university changed the definitions was mandated, even though it involved high-level school officials. Here, in contrast, the City has offered sworn testimony from its Chief Legal Officer stating that the City was *required* to obtain formal written approval of the new policy from two high-ranking City officers—Sink herself and the City's Chief Human Resources Officer—and that the City "*will not* be disseminating any further media advisories through the Media Advisory List or any other media email listserv." (emphasis added). Although the somewhat suspicious timing of the City's implementation of the new media relations policy—only 13 days after Plaintiff initiated this action—might otherwise raise concerns about whether the change was genuine, Sink's

sworn testimony establishes that the City went through a formal, organized process, even if self-imposed.[2]

We also note that Sink signed her sworn declaration under penalty of perjury and submitted it to the district court. Thus, violation of that declaration could expose Sink to possible prosecution for perjury or contempt. *See* 18 U.S.C. § 1621(2); 18 U.S.C. § 401(2). Further, our sister circuits have mooted claims based on government policy that was changed through sworn testimony provided by government officials. *Brown v. Buhman*, 822 F.3d 1151, 1170–72 (10th Cir. 2016) (finding action moot where a county prosecutor declared under penalty of perjury that the plaintiffs would not be prosecuted for bigamy); *Sossamon v. Texas*, 560 F.3d 316, 325 (5th Cir. 2009) (finding that an affidavit of the executive director of Texas Department of Criminal Justice stating that he had revised and ceased challenged practice mooted the plaintiff's claims and "obviate[d] any concern that the local prison officials might change their minds on a whim"); *Turner v. Tex. Dep't of Crim. Justice*, 836 F. App'x 227, 229 (5th Cir. Nov. 10, 2020) (finding as moot the prisoner's religious discrimination claims, where the prison director communicated through an affidavit that the prison's new policy permitted beards and headgear, and the prisoner "[could not] controvert [the director's] affidavit and [had] put forth no evidence to overcome the presumption of good faith to which government actors are entitled").

Plaintiff and Amicus both interpret *Speech First* to suggest that every regulatory change that is not implemented pursuant to a legally mandated process is necessarily "ad hoc." This interpretation of *Speech First* would reduce the first factor of the analysis to an inquiry only as to whether the law in question was implemented by traditional legislation. However, *Speech First* makes clear that even within the "non-legislation" category, there is still a category of regulatory changes that are "legislative-like." For that reason, we reject Plaintiff's contention that the City's change in media relations policy was not formal simply because the City did not follow

---

[2]It is not apparent that Sink's affidavit carries the same legal force as an actual government rule, but we conclude that, in this case, it establishes a controlling statement of the City's future intention regarding its media relations policy. *Compare with Ostergren v. Frick*, --- Fed. App'x ---, 2021 WL 1307433, at *5 (6th Cir. Apr. 8, 2021) ("Here, [the Tax Commission] simply voted in a public meeting to discontinue and stop enforcing the NDA. It appears that the Tax Commission could simply vote to reinstate the NDA—and begin enforcing it again—at a subsequent meeting."). In other words, the City has established a boundary or parameter that it will not revert back to the Media Advisory List, even if it has the discretion to change the media relations policy without notice.

"the procedures the City [Council] would have to utilize to repeal or replace an ordinance[.]" (Appellant Br. at 38–41) (citing Memphis, Tenn., Charter & Related Laws, art. 40, § 354 and noting that "[t]o pass an ordinance, a majority of the City Council must vote in favor of the proposed ordinance at 'three regular meetings' of the City Council.").[3]

Under these circumstances, we conclude that (1) the City has sufficiently engaged in a legislative-like procedure, and (2) there is no indication that the City would not follow the same—or a similar—process in the future were it to change the policy again. As the City aptly points out, to find these procedures "insufficient would essentially narrow the solicitude afforded to government entities to only situations involving *actual legislation*[.]" (emphasis added). *See also Sossamon*, 560 F.3d at 325 ("Without evidence to the contrary, we assume that formally announced changes to official government policy are not mere litigation posturing.") Accordingly, we find that the City's change in media relations policy was "legislative-like."

### 2. The City has demonstrated that the challenged conduct will not recur.

Because the City's change in media relations policy was "legislative-like," the City need only demonstrate that it will not revert to the Media Advisory List for us to conclude that the challenged activity is not likely to recur.

Despite Plaintiff's speculation that the City might re-implement the Media Advisory List, there is nothing in the record that would suggest the City is likely to return to its old ways, and Plaintiff has not otherwise cast doubt on the City's good faith in promulgating the new policy. Moreover, as explained above, to find that the change in policy was a sham, "we would have to conclude that the [City's] highest-ranking [legal officer] [] had engaged in deliberate misrepresentation to the court." *Brown*, 822 F.2d at 1170. On the record before us, there is no basis for us to make that conclusion.

---

[3]For the same reason, we reject Amicus' invitation to scrutinize "the formalities of the Memphis city government." Amicus points out that the Memphis Charter provides the Mayor with the "power to suspend any City officer for misconduct or dereliction in office . . . ". (Amicus Br. at 7) (quoting Memphis, Tenn., Charter & Related Laws, art. 27, § 181). Amicus suggests that because the Mayor's subordinates serve at his pleasure, their involvement in implementing any new City policy somehow makes that policy less formal. However, Amicus provides no legal support that would lead us to conclude that the City's policy should carry less force or legitimacy simply because at-will government employees played key roles in its implementation.

As a result, the possibility of the City's reversion to the Media Advisory List is merely theoretical, and the theoretical possibility of reversion to an allegedly unconstitutional policy is simply not sufficient to warrant an exception to mootness in this case. *See Larsen v. U.S. Navy*, 525 F.3d 1, 4 (D.C. Cir. 2008) ("[T]he mere power to reenact a challenged policy is not a sufficient basis on which a court can conclude that a reasonable expectation of recurrence exists." (brackets omitted)); *see also Martinko v. Whitmer*, 465 F. Supp. 3d 774, 777 (E.D. Mich. 2020) ("Plaintiffs' assertion that 'there is a good chance that these restrictions will come back'…is pure speculation and does not suffice to avoid the conclusion that their request for prospective injunctive and declaratory relief is moot."). To whatever extent the Manual provides the Mayor's office with the authority to change policies, it does not mean that the City will do so, or even that it is likely to do so. *Cf. City of Mesquite v. Aladdin's Castle*, 455 U.S. 283, 289–90 (1983) (rejecting a city government's argument that the repeal of a challenged ordinance mooted an appeal, where the city announced its intention to reenact the unconstitutional ordinance).

In any event, in our voluntary cessation cases involving government entities, our primary concern is not the mere possibility that the government *could* revert to a challenged practice but whether there is evidence that the government will "flip-flop" or has altered its conduct solely in response to litigation. *See, e.g.*, *A. Philip Randolph Inst. v. Husted*, 838 F.3d 699, 713 (6th Cir. 2016), *rev'd on other grounds*, 138 S. Ct. 1833 (2018) (finding case not moot where the defendant's directive issuing a new voter form "d[id] not inspire confidence" that the voluntary cessation was genuine, because the form at issue was amended "on a relatively frequent basis— at least four times in the last nine years, not counting the most recent revision" and there was no suggestion of a definitive commitment on the part of officials to refrain from reverting back to the form that was the subject of the lawsuit, let alone a sworn declaration stating as much); *Brandywine, Inc. v. City of Richmond, Ky.*, 359 F.3d 830, 836 (6th Cir. 2004) (finding as moot claims for injunctive and declaratory relief brought by operators of adult bookstore who lost their business license after being cited for zoning violation, where the city repealed allegedly unconstitutional provisions of zoning ordinance, "legislators had [not] publicly expressed an intention to re-enact the offending legislation […] [and] the passage of [the new ordinance] provide[d] sufficient assurance that [the challenged ordinance] [would] not be re-enacted."); *Ky. Right to Life, Inc. v. Terry*, 108 F.3d 637 (6th Cir. 1997) (finding as moot the plaintiffs' claims

challenging portions of an amended state statute, despite the plaintiffs' argument that the state was free to reenact prior statutory scheme, where there was no evidence of a "recalcitrant legislature" and the record was "devoid of any expressed intention by the Kentucky General Assembly to reenact the prior legislative scheme"); *Brower v. Nuckles*, 182 F.3d 916, 1999 WL 435173, at *2 (6th Cir. 1999) (unpublished table decision) ("The defendants' expressed intent to revoke the prior policy of prohibiting the use of open-flame candles, as stated in the deputy director's state-wide memorandum to all wardens, indicates that they have removed the challenged restriction . . . [T]he mere possibility that the defendants might reinstate the policy is insufficient to entitle [the plaintiff] to equitable relief.").

Here, there is simply no indication that the City intends to repeal the new policy. The City enacted a new media policy that not only resolved Plaintiff's particularized grievances, but completely overhauled its media policy as to *all* media members. *See Int'l Outdoor, Inc. v. City of Troy*, 974 F.3d 690, 699 (6th Cir. 2020) (finding that "extensive changes to *other terms*" of challenged regulation weighed in favor of finding mootness) (emphasis added). There is also no indication that the City has ever defended its use of the Media Advisory List. This is another distinguishing feature from *Speech First*, where, despite the university's rescinding of the definitions, the university "continue[d] to defend its use of the challenged definitions" and refused to make a commitment not "to reenact" them. *Speech First*, 939 F.3d at 769–770. In fact, the City has even gone a step further than disavowing the Media Advisory List—it has expressly stated that it "will not" use it again. Moreover, any individual City employee who attempts to recreate such a list would "be subject to disciplinary action" for violating the City's new policy. That aspect of the policy creates a self-enforcing mechanism that makes it only more likely that the change will be permanent.

In the end, "the question the voluntary cessation doctrine poses [is]: Could the allegedly wrongful behavior reasonably be expected to recur?" *Already, LLC v. Nike*, 568 U.S. 85, 92 (2013). There is simply nothing in the record that would indicate that the City is reasonably likely to re-implement the Media Advisory List and/or email listserv, much less that it would then fail to respond to Plaintiff's requests to be included on those lists. Plaintiff's general assertion that the City acted out of retaliatory animus against her is simply not a sufficient reason

to assume that the City will revert back to a policy that, after internal deliberations, it has expressly disavowed and expressly prohibited from reenactment. If the City's statements and testimony are to have any meaning at all, we do not see a reasonable possibility that the City will return to its previous policy anytime soon. The record in this case demonstrates that the Media Advisory List has been eliminated for good, and, as such, the City's change in media relations policy is "genuine" and "provides a secure foundation" for us to conclude that the challenged practices are not likely to recur. *Mosley v. Hairston*, 920 F.2d 409, 415 (6th Cir. 1990) (internal quotation marks omitted).

**B. The City has met its burden in demonstrating that its change in media relations policy completely and irrevocably eradicated the effects of the challenged conduct.**

The district court did not explicitly address the second prong of the voluntary-cessation analysis: whether "interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *Davis*, 440 U.S. at 631. Nevertheless, the parties present arguments as to this factor, and because it implicates our jurisdiction, we must consider it *sua sponte*. *Bonner v. Perry*, 564 F.3d 424, 426 (6th Cir. 2009).

For mostly the same reasons as stated above, we conclude that the City's change in media relations policy has completely and irrevocably eradicated the effects of the alleged violation. Sink's declaration makes clear that, as part of the new media relations policy, the City "has posted all media advisories on [its Twitter account]" and "on www.memphistn.gov." To the extent that Plaintiff is concerned that she will suffer further harm from the new media relations policy going forward, the harmful effects would stem from *the new policy*, not the Media Advisory List.

Plaintiff contends that "[t]he new media policy does nothing to eradicate the effects of the City's repeated refusal to add her to the Media Advisory List, which resulted in her missing opportunities to learn and gather news about the City, including the joint virtual press conferences related to the ongoing [COVID-19] pandemic." However, Plaintiff's argument is misplaced, because other than costs and attorney's fees, Plaintiff did not seek damages or any other relief from any alleged injuries that would persist after the City changed policies. As we

have explained, dismissal on mootness grounds is mandatory "[i]f after filing a complaint the claimant loses a personal stake in the action, making it 'impossible for the court to grant any effectual relief[.]'" *Hrivnak v. NCO Portfolio Mgmt., Inc.*, 719 F.3d 564, 567 (6th Cir. 2013) (quoting *Church of Scientology v. United States*, 506 U.S. 9, 12 (1992)). Any injunction or order declaring Plaintiff's alleged removal from the Media Advisory List unconstitutional would amount to exactly the type of advisory opinion that Article III prohibits. We thus cannot conclude that an injunction against the City would have any practical effect.[4]

## IV.

Because the voluntary-cessation exception to mootness is not applicable to this case, the district court did not err in granting the City's motion to dismiss. We therefore AFFIRM the judgment of the district court.

---

[4]Plaintiff also argues that "[t]the public interest in having this [case] decided is strong and militates against a finding of mootness." Plaintiff essentially contends that the Court has the authority to hear a non-live dispute whenever the resolution of important legal questions will serve the public. Plaintiff did not raise this argument before the district court, and we typically do not consider arguments presented for the first time on appeal. *United States v. Ellison*, 462 F.3d 557, 560 (6th Cir. 2006). Even so, this Circuit has rejected the existence of any such "public-interest" exception in the voluntary-cessation context. *See Fialka-Feldman v. Oakland Univ. Bd. of Trs.*, 639 F.3d 711, 715 (6th Cir. 2011) ("A stand-alone public interest exception to Article III has no meaningful pedigree. The Supreme Court has never recognized any such exception and in several instances has refused to adopt one.").