NOT RECOMMENDED FOR PUBLICATION
File Name: 22a0030n.06

No. 21-2602

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

**FILED**
Jan 19, 2022
DEBORAH S. HUNT, Clerk

| | |
|---|---|
| KENNETH A. THOMPSON; DARLENE DOWLING THOMPSON; MARK L. DE YOUNG; FREDRICK D. GULICK, SR.; ANN E. GULICK; ROBERT L. JEFFORDS; KENNETH R. SPIEGEL; SHAWN M. JACKSON; DAVID ISAAC; JULIE ISAAC; JEFFREY S. PRITCHARD; HAPPY LAWN, dba Linda F. Jackson; MELVIN L. JOHNS; THOMAS EARL DUNN; LINDA L. DUNN; KRYSTYNA JOHNS; CHARISE SPINK, dba His And Her Storage; ROGER E. RAYCRAFT, JR.; ELIZABETH L. RAYCRAFT; GAYLE L. GUTCHAK; RORY C. GUTCHAK; WILLIAM E. NORRIS; IVAN MORSE; PAUL C. LESLIE, Pastor; DEANNA K. LESLIE; LINDA LEE TARVER, Dr.; TARVER CONSULTING; TRACY BOLLE; THE EVENING POST, LLC; HAPPY LAW; STEVE A. MCINTOSH; ELOISE A. MCINTOSH; RODNEY D. FATER; VICKY L. FATER; REX S. COOPER; VICKIE L. COOPER; DAVID A. ARNDT; DORIS S. ARNDT; JACK L. ELLIOTT; TIMOTHY R. WALTERS; COLTON R. WALTERS; WILLIAM SCOTT; DEBORA SCOTT, <br><br> Plaintiffs-Appellants, <br><br> v. <br><br> GRETCHEN WHITMER, in her official capacity as Governor for the State of Michigan; GARLIN GILCHRIST, II, Lieutenant Governor, in his official capacity as Lieutenant Governor of the State of Michigan and as President of the Senate; ROBERT GORDON, in his official capacity as Director Michigan Department of Health and Human Services; DANA NESSEL, in her official capacity as Michigan Attorney General; JOSEPH GASPER, in his official capacity as Director of the Michigan State Police; JONEIGH S. KHALDUN, in her official capacity as Chief Medical Executive and Chief Deputy Director for Health, <br><br> Defendants-Appellees. | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF MICHIGAN |

Before: COLE, LARSEN, and MURPHY, Circuit Judges.

MURPHY, Circuit Judge. For several months after the start of the COVID-19 pandemic, Michigan's governor issued dozens of executive orders that closed Michigan businesses and directed Michigan residents to stay home. A large group of residents sued to challenge these orders. The residents' complaint alleges in great detail their theories why the orders violated many constitutional provisions. Yet the complaint alleges no detail about the residents themselves; it says only that they are "domiciled" in Michigan and "conducting business." Compl., R.1, PageID 11. It is not clear that these conclusory allegations sufficed to plead their standing to challenge any executive order. Yet the governor has now rescinded the orders, and the Michigan Supreme Court has found that she lacked the state-law authority to issue them. So the residents' requests for declaratory and injunctive relief are moot. And while they also brought a damages claim, they chose to sue the state officials only in their official (not personal) capacities. The state's sovereign immunity thus bars this damages claim. In short, we affirm the dismissal of the complaint.

I

On March 10, 2020, the Michigan governor declared a state of emergency in Michigan after officials identified two presumed cases of COVID-19. Over the next few months, the governor signed a series of executive orders limiting what Michiganders could do. The orders closed schools, prohibited people from congregating in large groups, and shuttered restaurants, bars, gyms, and other places of public accommodation. The governor also barred residents from leaving their homes except for permitted purposes. This general "stay-at-home" order remained in place, in one form or another, until June 1, 2020, when the governor declared that "Michiganders [were] no longer required to stay home." Order 2020-110, R.11-17, PageID 283. During this time, the governor asserted that she had the authority to issue these orders under both the Emergency

Management Act of 1976, *see* Mich. Comp. Laws § 30.403(3)–(4), and the Emergency Powers of the Governor Act of 1945, *see id.* § 10.31(1).

About two weeks before the governor lifted the stay-at-home mandate, a large group of Michigan residents (whom we will call the "residents") sued her and five other state actors in their official capacities. The residents alleged that the executive orders violated the U.S. Constitution and the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961–1968. They brought their constitutional claims under 42 U.S.C. § 1983 and their RICO claims under 18 U.S.C. § 1964(c). They sought declaratory and injunctive relief and some $7.5 million in damages.

The officials moved to dismiss the residents' complaint. Before the district court could rule on their motion, the Michigan Supreme Court issued a relevant decision in a different case. Healthcare providers had filed a separate federal suit challenging the executive orders that barred them from offering some healthcare services. *See In re Certified Questions*, 958 N.W.2d 1, 7 (Mich. 2020). The district court in that suit certified questions to the Michigan Supreme Court about the validity of the executive orders under the two relevant state statutes. *See Midwest Inst. of Health, PLLC v. Whitmer*, 2020 WL 3248785, at *1 (W.D. Mich. June 16, 2020). The Michigan Supreme Court held that the governor's executive orders were invalid under state law. *Certified Questions*, 958 N.W.2d at 9–25. It interpreted the Emergency Management Act to bar the governor from issuing emergency executive orders that last longer than 28 days without legislative approval. *Id.* at 9–11. And it held that the Emergency Powers of the Governor Act unconstitutionally delegated legislative power to the governor under the Michigan Constitution. *Id.* at 16–24; *see House of Representatives v. Governor*, 949 N.W.2d 276, 276 (Mich. 2020).

Back in this case, the district court found that these state-law developments affected the residents' federal claims against the governor's executive orders. It concluded that the governor's

3

rescission of those orders—together with the Michigan Supreme Court's decision finding them invalid—mooted the residents' requests for declaratory and injunctive relief. *See Thompson v. Whitmer*, 2021 WL 2118281, at *1 (W.D. Mich. Feb. 10, 2021). In addition, although the residents sought damages against the state officers, the court held that the state's sovereign immunity barred these damages claims. *Id.*

The residents moved for relief from judgment under Federal Rule of Civil Procedure 60(b), alleging that the district court had been biased. The court denied the motion. *Thompson v. Whitmer*, 2021 WL 2451688, at *1 (W.D. Mich. May 24, 2021).

This appeal followed. We review the court's grant of the motion to dismiss de novo. *See Ass'n of Am. Physicians & Surgeons v. FDA*, 13 F.4th 531, 535 (6th Cir. 2021).

II

The residents asked the district court to issue a declaration that the governor's executive orders violated federal law, an injunction against enforcement of the orders in the future, and damages for injuries that the orders caused in the past. But their claims for declaratory and injunctive relief are moot, and their claim for monetary relief fails on sovereign-immunity grounds.

A. Declaratory and Injunctive Relief

The Constitution grants the "judicial Power" to federal courts only over "Cases" or "Controversies." U.S. Const. art. III, § 2. This text does not allow courts to intervene in the operations of a state government simply because concerned residents believe that the government has acted unlawfully. *See Ass'n of Am. Physicians*, 13 F.4th at 536. Under our separation of powers, courts instead can assess the legality of government conduct only when deciding a "case" of the kind that the judicial branch has historically resolved. *See Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 798 (2021); *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102 (1998).

The Supreme Court has established various rules that litigants must meet to make out a traditional (and hence justiciable) "case." Two are relevant here. Plaintiffs must first show that they have "standing." *See Steel Co.*, 523 U.S. at 102. To do so, they must allege that they have suffered (or are at imminent risk of suffering) an injury that was (or will be) caused by the defendant's conduct and that can be redressed by the requested relief. *See id.* at 102–03. The second ("mootness") rule ensures that these injury, causation, and redressability requirements continue to be met throughout the litigation. *See United States v. Sanchez-Gomez*, 138 S. Ct. 1532, 1537 (2018). If a defendant proves that later events have eliminated a plaintiff's injury or made it impossible to grant relief, the case has become "moot" and a court cannot address its merits. *See Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 189–91 (2000).

These standing and mootness rules must be met for each form of relief that a plaintiff seeks. *See DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352–53 (2006). So, for example, a claim that a police officer harmed a plaintiff in the past (say, through an unconstitutional chokehold) may give the plaintiff standing to seek the traditional relief available for past harms: monetary damages (even if only nominal). *See City of Los Angeles v. Lyons*, 461 U.S. 95, 109 (1983); *see also Uzuegbunam*, 141 S. Ct. at 797–800. But past injury alone will not give the plaintiff standing to seek a forward-looking injunction against the officer's future conduct unless the same plaintiff identifies an imminent risk of incurring the same injury. *See Lyons*, 461 U.S. at 111–12. In other words, a request for prospective relief must be accompanied by an allegation of prospective injury.

Even if a plaintiff has standing to seek this forward-looking relief at the start, moreover, a defendant's decision to stop engaging in the injurious conduct can moot a claim for the relief during the litigation. *See Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91–92 (2013); *Diffenderfer v. Cent. Baptist Church of Mia., Inc.*, 404 U.S. 412, 414 (1972) (per curiam). A legislature might

5

repeal the law that regulated the plaintiff, and that change can sometimes moot a request for an injunction against the law's enforcement. *See Diffenderfer*, 404 U.S. at 414; *Lyda v. City of Detroit* (*In re City of Detroit*), 841 F.3d 684, 693 (6th Cir. 2016); *see generally* 13C Charles A. Wright et al., *Federal Practice and Procedure* § 3533.6, at 259–319 (3d ed. 2008). Or an executive officer might amend the policy that covered the plaintiff, which likewise can sometimes moot a request for an injunction against this policy. *See Hanrahan v. Mohr*, 905 F.3d 947, 962–63 (6th Cir. 2018); *Mosley v. Hairston*, 920 F.2d 409, 414–15 (6th Cir. 1990); *see generally* 13C Wright et al., *supra*, § 3533.7, at 319–75.

That said, defendants bear a "formidable burden" when they claim that a case has become moot because of their changed ways. *Already*, 568 U.S. at 91 (quoting *Laidlaw*, 528 U.S. at 190). They must show both that they are not reasonably likely to engage in the challenged conduct again and that the change (if it lasts) would eliminate the plaintiff's claimed injury. *See Thomas v. City of Memphis*, 996 F.3d 318, 324 (6th Cir. 2021). Courts often find these standards met when some external factor provided the motivation for a defendant's change. We, for example, have held that an executive officer's decision to amend a regulation mooted a challenge to the regulation because the amendment sprang from Congress's decision to change the background law. *See Mosley*, 920 F.2d at 414–15. And the Supreme Court has held that a federal constitutional challenge to the denial of state-law benefits was mooted by a state court's decision interpreting the state law to make the plaintiffs eligible for the benefits. *See Geduldig v. Aiello*, 417 U.S. 484, 491–92 (1974); *see also Bethell v. Florida*, 741 F.2d 1341, 1342 (11th Cir. 1984) (per curiam).

These rules doom the residents' requests for declaratory and injunctive relief. At the outset, it is far from clear that the residents even pleaded their standing to seek this relief. They needed to plausibly allege that they faced an imminent risk of suffering a future injury from each of the

executive orders that they challenged. *See Lyons*, 461 U.S. at 111–12; *Ass'n of Am. Physicians*, 13 F.4th at 543. Their complaint spends pages asserting abstract ways in which the executive orders violate the Constitution (ranging from the denial of the free exercise of religion to the impairment of the obligation of contracts). But the complaint lacks the most basic of factual allegations about the residents themselves or how these orders injured them. The complaint does not allege that any resident planned to (but could not) attend a religious service because of an executive order. *Cf. Maryville Baptist Church, Inc. v. Beshear*, 977 F.3d 561, 563–64 (6th Cir. 2020) (per curiam). Nor does it allege that a resident operated a specific business (like a gym) closed by an order. *Cf. League of Indep. Fitness Facilities & Trainers, Inc. v. Whitmer*, 843 F. App'x 707, 708–09 (6th Cir. 2021). And it does not allege that the residents planned to gather in groups larger than those allowed by an order. *Cf. Ramsek v. Beshear*, 989 F.3d 494, 496–97 (6th Cir. 2021). Rather, the complaint's only plaintiff-specific allegations assert that the residents are "domiciled within" Michigan and that they "stand in their capacity as Michiganders, who[] are conducting business." Compl., R.1, PageID 11. That is it.

At most, these allegations might suffice to plead an injury from the general stay-at-home order. Yet any challenge to that order has been mooted by later events. The governor rescinded the stay-at-home order (along with the other orders) a few weeks after this suit began. So the residents lack a live interest in obtaining declaratory or injunctive relief against this now-inoperable order. *See Hanrahan*, 905 F.3d at 960–61.

Admittedly, whether the governor's voluntary decision to rescind the order *by itself* sufficed to prove that she was not reasonably likely to reissue a similar order might have raised a difficult mootness question. *Compare Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 68–69 (2020) (per curiam), *with Ramsek*, 989 F.3d at 499–500; *Pleasant View Baptist Church v.*

*Beshear*, 838 F. App'x 936, 938–39 (6th Cir. 2020) (order). But a separate factor leaves no doubt that the governor's decision to rescind the stay-at-home order has mooted the residents' request for prospective relief against the state officials. The Michigan Supreme Court has since ruled that the governor lacked the authority to issue any of the executive orders under Michigan law—which makes it "absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." *Laidlaw*, 528 U.S. at 190; *see Certified Questions*, 958 N.W.2d at 31; *cf. Bethell*, 741 F.2d at 1342. For that behavior to recur, the governor would have to disregard the Michigan Supreme Court's interpretation of state law. We would not reasonably expect that result.

We have already made this point in a similar case. A trade organization for fitness facilities had brought a challenge to the governor's executive orders regulating gyms. *See League of Indep. Fitness Facilities*, 843 F. App'x at 708–09. Although this organization had standing to sue, we held that its challenge was mooted by the combined effect of the governor's decision rescinding the executive orders and the Michigan Supreme Court's decision finding them invalid. *See id.* at 709–10. The request for prospective relief in this case warrants the same result.

In response, the residents argue that a claim for nominal damages can save a case from a mootness finding even if a defendant changes its injurious policies during the litigation. *See Uzuegbunam*, 141 S. Ct. at 797–800. True enough. But this argument conflates the residents' *claims* for injunctive and declaratory relief with their *case* as a whole. Unlike the plaintiffs in *Uzuegbunam*, the residents here did not need to rely on a nominal-damages theory because they alleged actual damages. Their damages claim for past injuries is not moot. *See Lyons*, 461 U.S. at 105, 111. But the residents must independently meet these standing and mootness rules for each remedy. *See Cuno*, 547 U.S. at 352–53. And they offer no basis to find that their distinct claims for declaratory and injunctive relief remain live. So these other claims are moot.

B. Damages

This mootness finding leaves the residents' damages request for the past injuries that they allegedly suffered from the prior operation of the executive orders. As noted, it is not clear that the residents' factual allegations (that they live in Michigan) plausibly pleaded an injury. But we need not decide that point. Their request for damages fails on sovereign-immunity grounds.

As the Eleventh Amendment illustrates, states are generally entitled to sovereign immunity from suits brought by private parties seeking damages in federal court. *See Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 54 (1996). This immunity also reaches suits against state officers when a judgment would put the state itself on the hook for the award. *See Edelman v. Jordan*, 415 U.S. 651, 663 (1974). Still, Congress may abrogate the states' sovereign immunity and make them subject to suit if it passes the relevant law under certain constitutional provisions (but not others). Congress, for example, may abrogate the states' sovereign immunity under its power to enforce the Fourteenth Amendment, but not its power to regulate interstate commerce. *See Seminole Tribe*, 517 U.S. at 59–72. Yet even when it passes a law under a constitutional provision that gives it this power, Congress must speak clearly if it intends to subject the states to suit. Courts will not interpret ambiguous laws to abrogate that immunity. *See Raygor v. Regents of Univ. of Minn.*, 534 U.S. 533, 541–43 (2002); *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 65 (1989).

This sovereign-immunity framework requires us to consider the specific laws under which the residents have sued the state officers. They allege constitutional claims against the officers under 42 U.S.C. § 1983 and a RICO claim against them under 18 U.S.C. § 1964(c). Neither cause of action can overcome Michigan's sovereign immunity.

Start with the constitutional claims under § 1983. The Supreme Court has long interpreted § 1983 not to abrogate the states' sovereign immunity. *See Quern v. Jordan*, 440 U.S. 332, 340–

41 (1979); *Hutsell v. Sayre*, 5 F.3d 996, 999 (6th Cir. 1993). Indeed, the Court has made clear that § 1983 does not even cover the states as a statutory matter. The statute permits a plaintiff to sue a "person," 42 U.S.C. § 1983, and the Court has interpreted the word "person" to exclude the states, *see Will*, 491 U.S. at 63–70. Critically, moreover, its interpretation of the word "person" also excludes state officers when sued for damages in their *official* capacities. *See id.* at 71. The Court reasoned that such a suit is "against the official's office" and so "no different from a suit against the State itself." *Id.*; *see Kentucky v. Graham*, 473 U.S. 159, 165–68 (1985).

We must add two caveats to this § 1983 test. Caveat One: Courts routinely entertain damages claims against state officers under § 1983 for the violation of constitutional rights. Why? In those claims, the plaintiffs sued the officers in their *personal* capacities and thus may legally seek money only from the officers' bank accounts (even if many states opt to reimburse officers as a discretionary matter). *See Graham*, 473 U.S. at 166. Because the real parties in interest are the officers accused of violating federal law, the actions fall within § 1983 and do not implicate a state's sovereign immunity. *See Hafer v. Melo*, 502 U.S. 21, 27 (1991). Caveat Two: Courts routinely entertain suits against state officers even in their official capacities when the plaintiff seeks prospective injunctive relief. *See Ex Parte Young*, 209 U.S. 123, 150–56 (1908). Why? These suits are likewise not treated "as actions against the State." *Graham*, 473 U.S. at 167 n.14; *see Will*, 491 U.S. at 71 n.10. (That is why sovereign immunity would not have barred the residents' claims for injunctive relief if those claims were not moot.)

Given the residents' pleading choices in this case, though, sovereign immunity and the relevant § 1983 caselaw foreclose their damages claims for the alleged constitutional violations. The residents unambiguously decided to sue each of the six state actors in their official capacities, not their personal capacities. Their complaint even emphasized this point. The allegations

identifying the governor, for example, state that she "is being sued in her official capacity *only*." Compl., R.1, PageID 11 (emphasis added). The complaint makes identical statements for the other state officers. *Id.*, PageID 11–13. Thus, the State of Michigan is the real party in interest, and the residents cannot sue it under § 1983. *See Will*, 491 U.S. at 71.

The residents' damages claim under RICO fares no better. Congress enacted RICO under its authority to regulate interstate commerce. *See* U.S. Const. art. I, § 8; *Waucaush v. United States*, 380 F.3d 251, 255 (6th Cir. 2004). Yet Congress lacks the constitutional power to abrogate the states' sovereign immunity under the Commerce Clause. *See Fla. Prepaid Postsecondary Educ. Expense Bd. v. Coll. Savings Bank*, 527 U.S. 627, 635–36 (1999). And nothing in RICO shows a clear indication that Congress intended to waive the states' sovereign immunity anyway. *See* 18 U.S.C. § 1964(c). So we have previously applied sovereign immunity to bar RICO claims asserted against state officials in their official capacities. *See Chaz Constr., LLC v. Codell*, 137 F. App'x 735, 743 (6th Cir. 2005); *see also Bair v. Krug*, 853 F.2d 672, 673–75 (9th Cir. 1988).

In response, the residents seem to argue that their claims for damages do not trigger Michigan's sovereign immunity because they are "equitable." They fail to explain why we should consider these claims equitable. Regardless, sovereign immunity covers retroactive claims for money against the state even when they are "labeled 'equitable' in nature." *Edelman*, 415 U.S. at 666. So the residents' claims cannot be saved by clever pleading.

The residents also reassert their claim—raised for the first time in a Rule 60(b) motion—that the district court harbored bias against them. Because this claim made its initial appearance in a motion to reopen the judgment, we review it for an abuse of discretion. *See Williams v. Browman*, 981 F.2d 901, 903 (6th Cir. 1992) (per curiam). The residents point to no evidence of bias other than the court's decision to rule against them. Yet it is black-letter law that adverse

rulings against a party alone can almost never establish bias. *See Liteky v. United States*, 510 U.S. 540, 555 (1994); *Burley v. Gagacki*, 834 F.3d 606, 616 (6th Cir. 2016). And nothing the court said in its ruling revealed the "high degree of favoritism or antagonism" that is required. *Liteky*, 510 U.S. at 555. To the contrary, the court dispassionately got the law right.

We affirm.